[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
ARTICULATION OF DECISION RENDERED MARCH 28, 1990
1. Nature of Proceedings
By petitions coterminously filed 8/1/89, the Department of Children and Youth Services (DCYS) alleges Valerie M., born six days earlier, to be a neglected, abused and uncared-for child within the definitions of Sec. 46b-120
of the Conn. Gen. Stats (Rev. 1989), and at the same time seeks to terminate the parental rights of Jean D. and John M., her mother and putative (later acknowledged) father on the ground that the infant had sustained a nonaccidental serious physical injury at the time of her birth, prima facie ground for such termination under section 45-61f, incorporated by reference into Sec. 17-43a, subsection (e). Two further grounds for termination were added by motion 10/4/89 (abandonment; absence of parent-child relationship). At the time of filing, the petitioner secured an Order of Temporary Custody (O.T.C.) pursuant to the provisions of subsection (b) of Sec. 46b-129 based upon a pediatrician's affidavit that the mother's intravenous injection of cocaine during labor". . . contributed to the precipitous delivery and the passage of meconium which thus put this baby in great risk of life-threatening medical complications." (State's Exh. C.)
In a hearing on the O.T.C. held within 10 days, as required by law, service was confirmed on both parents who appeared with separate counsel, agreed to the continuation of the O.T.C., entered pleas denying pro forma all allegations of both petitions, and were ordered to participate in a psychological evaluation pursuant to Sec. 17-38a(f). The results of this evaluation were to be discussed at a pretrial conference set for 9/18/89. That date was continued when the original appointments for evaluation were not kept: The evaluator postponed seeing the mother until he could be assured that her previously diagnosed hepatitis was not contagious. Since her whereabouts had become unknown, such assurance was not immediately obtainable. Further, the father failed to appear for his scheduled evaluation and Valerie could not be brought to the interaction session since her foster mother was required to suction her breathing passages on an hourly basis. (Report of Dr. David Mantell to the court dated 9/7/89.)
The previously scheduled pretrial conference was held 9/18/89 nonetheless, but neither parent appeared. Valerie, at that time, was back in the hospital. A trial date was set for 10/4/89, at which time Jean D. appeared, but was continued because of the father's hospitalization. A subsequent trial CT Page 171 date was set for 11/8/89 and the psychological evaluation ordered to be rescheduled provided that the mother first obtained the requested medical clearance.
At the initial trial date of 11/8/89, John M. acknowledged paternity of Valerie and upon confirmation of this fact by Jean D. he was adjudicated to be the father of that child and the petitions amended accordingly. Further hearings were held on 12/13/89, 1/17/90 and 2/21/90. On the latter date all sides rested, and requested a month in which to file trial memoranda. All parties agreed that the court would render its judgment from the bench the following week (3/28/90) rather than taking the papers for a written memorandum of decision in the interest not only of a speedy resolution to a case filed at the birth of a now eight-month old baby but also of the parents' more complete understanding. At the dispositional hearing on 3/28/89, however neither parent appeared. The father had called neither the court nor his attorney; the mother had called the court to say she had no ride to court, although she had not earlier called her attorney or the state social worker to request transportation. In the absence of the parents, judgment was rendered in abbreviated form with the understanding that further explanation would be made if the mother found her way to the court later in the day. No continuance was granted in view of the parents' having lied about the circumstances of an earlier failure to appear (7/26/89) regarding an older sibling of Valerie's, and also because the parents had been given five weeks advance notice by the court of the 3/28/90 hearing.
From the bench the court found Valerie to be an uncared-for child in both senses of the word found in Sec.46b-120 — homeless, and a child with specialized needs. (Transcript, pp. 11-12). It was further found that the child's condition at birth evidenced a denial of proper care and attention, one of the definitions of neglect found in Sec.46b-120, and that the use of cocaine in the last stages of labor constituted abuse (Tr. 15). The court also found that the petitioner had sustained its burden of establishing by clear and convincing proof that the child, by reason of her mother's use of intravenous cocaine in the last stages of pregnancy and her father's participation in procuring the drug for the mother had been "denied, by reason of act or acts of parental commission or omission, the care, guidance or control necessary for. . . [her] physical, educational, moral or emotional well-being", grounds, under the applicable statute, for terminating a parent's rights. (Tr. 15) Additionally it was found that the state had sustained its burden of establishing the second originally pleaded ground for such termination: The lack of any parent-child CT Page 172 relationship, as defined by statute, and the detrimental effect of permitting further time in which to establish such relationship. (Tr. pp. 18-19) The third ground pleaded for termination of the parents' rights (abandonment) was dismissed. Having considered the six factors enumerated in Subsection (h) of Sec. 45-61f (Tr. pp. 21-25), and all of the circumstances leading up to the final date (2/21/90), it was found by clear and convincing evidence to be in Valerie's best interests to be placed forthwith in permanent adoption with responsible parents, rather than to wait any longer than the seven months of her life to dispositional date (2/21/90) for her parents to rehabilitate as her year-older sibling was then being required to do. The parental rights of Jean D. and John M. in and to their daughter, Valerie M., were thereupon terminated and the Commissioner of DCYS appointed statutory parent for the purpose of placing the child in adoption.
Within the 20 day appeal period, the respondent mother filed an application for waiver of fees, pursuant to Sec. 4017 of the Practice Book. Over the petitioner's objection, this motion, as well as a simultaneously filed motion to withdraw by her trial counsel, was granted. The granting of the motion for waiver of fees had the effect of extending the appeal period to 5/15/90 and, immediately upon granting of trial counsel's motion to withdraw, the court ordered a new attorney to be appointed to evaluate the record and advise if he or she would represent the mother on this appeal. The court clerk was able to locate an attorney practicing in another county who was willing to do so, and on the last date for filing, 5/15/90, an appeal was duly filed.
Because the remarks on the record on 3/28/90 were abbreviated, due to the parents' absence, and unclear in the transcript, this articulation of the decision and the evidence on which it was based is required to facilitate informed appellate scrutiny.
2. Procedure to be followed
Where neglect and termination petitions are coterminously filed under subsection (e) of Sec. 17-43a, the court is required, first, to address the allegations of the neglect petition and determine, by a fair preponderance of evidence (P.B. Sec. 1043) if the child has been neglected or abused as of the date the petition was filed or last amended (here, 11/08/89) under the statutory definitions found in Sec. 46b-120 and Sec. 17-38a, subsection (b) which define the term "abuse". If the petitioner's evidence does not support such a finding, then both petitions must be dismissed. Second, if the court finds the child to have been CT Page 173 neglected or abused, disposition will be deferred until a decision is rendered on the termination petition since the granting of the relief there sought — the appointment of a statutory parent — transfers not just the custody and guardianship conferred upon DCYS by a commitment under subsection (d) of Sec. 46b-129, but also all residual parental rights including the right to place the child in adoption. Sec. 45-61h. If the evidence offered by the petitioner does not support, by a clear and convincing standard of proof (Sec. 45-61f(f); P.B. Sec. 1049) grounds for terminating parental rights under Sec. 45-61f, subsection (f) incorporated by reference in Sec. 17-43a(e), the court must return to the neglect petition and dispose of it, on facts of the final trial date, (here, 2/21/90), either by committing the child to DCYS under subsection (d) of Sec.46b-129, leaving the child with the parent under court-ordered protective supervision (subsection (i) of Sec. 17-32d), or dismissing the case from further court accountability. Third, if grounds for termination of the parent's rights are found, the court must consider, as of the final trial date, whether such termination is in the best interests of the child after considering the six factors set forth in subsection (h) of Sec. 45-61(f).
3. Facts
Evidence offered in four days of trial over a period of three months, interpreted in light of the record in this court concerning Valerie's older sibling, Amanda, of which judicial notice is taken, supports the finding of the following facts:
Jean D. began using liquor and drugs at the age of eleven. (Testimony of respondent mother, 1/17/90). At fifteen she met John M. and at sixteen, having left school and home, began living with him. When snorting cocaine became impossible for John because of damage to his nose, they both began injecting the drug intravenously.
In 1987 Jean became pregnant with the first child to be born to her and John, an earlier pregnancy having been terminated. When she first visited her obstetrician in December of 1987, she was four months pregnant. When she disclosed her history of substance abuse, the doctor warned her of the impact on the unborn child and gave her literature on the subject. She was able to stop using cocaine almost completely during this pregnancy, giving birth to Amanda on 5/12/88 who displayed no apparent problems as a result of her mother's continuing use of tobacco, alcohol, marijuana and cocaine. Three months later, however, Jean resumed using cocaine, both by smoking and CT Page 174 intravenous injections, two to five times a week. (Id.) In October, 1988, she became pregnant with Valerie, but claimed to be unaware of the pregnancy until March of 1989, when she went to the obstetrician for the first time. Again they discussed her substance abuse and the problems it could present to the unborn child. She informed the doctor that she had stopped using cocaine and was only drinking a few beers and smoking a few joints every week, but he warned her of the potential problems to the unborn child presented even by this limited use. In fact, however, by this time Jean had become addicted to cocaine, and, unlike when pregnant with her first child, this time she was unable to stop.
Because she had no medical insurance, Jean informed the obstetrician that she would be continuing prenatal care at the Bristol Hospital Clinic after her first visit to him on 3/20/89. Dr. Zomick, the obstetrician, forwarded her record there and only learned in July, when Jean returned to him two weeks before Valerie's birth, that she had not gone to that clinic until 6/5/89. Under normal circumstances a pregnant woman should be seen monthly for the first 28 weeks, then biweekly and, in the final month, weekly. This would be more frequent for "high risk" pregnancies, such as that presented by a drug-abusing mother.
On 6/19/89, John's probation officer went to the parents' home to investigate a report that both were using drugs. He found Jean at home, observed marijuana and drug paraphernalia as well as pieces of glass from a broken window all over the floor on which 13-month old Amanda was lying — "I almost stumbled over the kid," (testimony of probation officer Fragione, 12/13/89 — and arrested both parents. Amanda was taken to Bristol hospital and the parents advised to place her in foster care while they both entered treatment for intravenous cocaine addiction to which they both had admitted. (Testimony of Carlin Glaser, 11/8/89; testimony of Karen Brinkman, 12/13/89). Hospital social worker Glaser specifically warned them of the risk to a fetus from intravenous cocaine use. When they refused both voluntary placement of Amanda and entry into drug treatment, a petition was filed by DCYS on 6/28/89 alleging Amanda to be neglected and an O.T.C. was secured so that she might be removed from the hospital an placed in foster care. In the 7/6/89 hearing on the O.T.C., the parents agreed to its continuance until the plea hearing on the underlying petition scheduled for 12:45 p. m. on 7/26/89 when both parents could be represented by counsel.
On the plea date, at the scheduled hour for the hearing, the parents called the court informing that Jean's water had broken, she was about to deliver her baby and they CT Page 175 were on the way to the hospital. Pro forma denials were entered on their behalf by their separate attorneys, and the matter continued for a pretrial. In fact, however, the parents were not at or on the way to the hospital when they called the court. Instead, by her own admission to Glaser (testimony 11/8/89) and in court (1/17/90), Jean was at home, injecting a quarter-gram of cocaine because "It was right there,"; she "could not refuse" to use it. Despite the repeated warnings from Dr. Zomick, Carlin Glaser and Karin Brinkman, "I really didn't realize it would do such damage." She did not present herself to the hospital until 9 p. m. and the baby was born an hour later. (State's Exh. A., Discharge Summary.) At birth, Valerie was pale, with poor muscle tone, and required oxygen. (Id.) The greatest danger to her survival was the inhalation of meconium (stool of an unborn child) which was inhaled in the birth process, a condition that can be severely life-threatening and might have proven fatal. (Testimony of Dr. Hodder, 12/13/89.) The most common cause for this condition is stress to the baby from a precipitous delivery which here most probably had resulted from the intravenous injection of cocaine during labor. The hospital discharge summary noted that ". . . the second stage was precipitous lasting only four minutes." (State's A., p. 2.) Only with vigorous and aggressive suctioning of her air passages before being fully delivered was Valerie able to start breathing and avoid a "potential severe respiratory problems" (State's Exh. C). Since the most medically probable explanation for this life-threatening condition had been the mother's use of cocaine "when she was leaking amniotic fluid and expecting to go into labor", a circumstance the attending pediatrician termed "intentional severe parental neglect" (ID.; testimony of Dr. Hodder 12/13/89), DCYS instituted the present action seeking the permanent removal of the child born under these circumstances.
At birth Valerie was a "child in classic withdrawal", extraordinarily jittery, shaky, with a piercing cry and unable to make eye contact. Nurses were required to spend one-to-one time with her, swaddling, rocking her vertically, eliminating all stimuli. (Testimony of Carlin Glaser, 11/8/89). The parents gave no emotional response when told of the baby's condition and did not appear surprised when told Valerie would need specialized care. Jean had much contact with the baby until her own discharge from the hospital a few days after giving birth. While still hospitalized, Carlin Glaser urged Jean to apply to a drug program and offered to help her do so. In the opinion of witness Glaser, (qualified as a drug and alcohol as well as child abuse prevention coordinator), Valerie could only be placed safely with her parents if they first engaged in intensive rehabilitation — at minimum a partial hospital program requiring three or four hours a day, three or four days CT Page 176 a week for six weeks. Even those who comply with this type of program have a fifty percent recidivist rate. Ms. Glaser found the "chances are not good" for an abuser such as Jean who had been on drugs for nine years, escalating use to two to five intravenous injections of cocaine weekly.
Jean did not enter any drug treatment program until October. James Archambault of the Bristol Hospital Counselling Center, advised her to begin with a 30 day inpatient program but acceded to her preference to begin as an outpatient. This entailed a commitment of three evenings a week, four hours each evening, for six weeks, to be followed with weekly sessions for the succeeding twelve weeks. Jean entered this program 10/9/89. For the next 10 days, she attended five times. She missed a scheduled session on 10/18/89 and when she came the next day, a urine screen disclosed cocaine use. She never returned. Mr. Archambault sent her a letter 10/31/89 but there was never any further contact. (Testimony of Archambault, 1/17/90.) On the same day the urine screen revealed cocaine use, Jean had visited Valerie in foster care (10/19/89) — the first visit since 9/8/89 when she had visited the baby during her second hospitalization for pneumonia in a matter of days. Although Valerie remained in the hospital for the next 10 days, neither parent returned to visit her there. (Testimony of foster parent Pastor, 1/17/90.) Jean returned for four more visits in two weeks following 10/19/89 but after November 1 only visited on December 8, January 13 and February 16. John M. visited once in August, once in October and not thereafter. He completed 21 days of a 25 day inpatient program at Blue Ridge but engaged in no aftercare, giving as his reason his lack of medical insurance. He did not explain why he was not insured under Title XIX since he had been unemployed since arrested the previous summer. (Testimony of respondent father, 2/21/90). He also did not explain why although eligible for unemployment benefits, he was not receiving them. Although the parents both testified to their intention to resume living together, at the time of their testimony (1/17/90) and (2/21/90) neither had a home — Jean lived with her mother; John, estranged from his parents, lived with a friend — and both were on probation for drug charges. Jean had had three jobs in three months; John remained unemployed. Neither had health insurance. Under cross examination, John admitted that when he wanted to use cocaine he had always found the money which he said was $50 a day (between $200 and $1,000 a day was the amount he told DCYS social worker, Dayner) but admitted he could not find this amount of money with which to continue drug treatment after his three-week inpatient experience.
In her clinical evaluation with psychologist Dr. Mantell, Jean admitted not being capable of caring for Valerie CT Page 177 at that time (November 1 and 2, 1989) and could not predict when she would be confident of her recovery from drug addiction, estimating it would take at least one year. (Testimony of Dr. Mantell, 11/8/89). In addition to being homeless, lacking any reliable source of income and still struggling with drug addiction, Dr. Mantell found both parents to be immature, impulsive and insecure. While he observed appropriate handling of the baby during their interaction with her, and heard their articulated interest in her, he saw no sign of bonding, no real connection between the baby and either parent, no evidence of a developing parent-child relationship. The evaluator found a low probability that either parent could maintain sobriety, given their long histories of substance abuse, and no evidence of any motivation for treatment until the state removed their children. Because both have many difficult problems to solve in every area of their lives, Dr. Mantell did not find it reasonably likely that they would be able to establish a parent-child relationship with Valerie in the future:
 . . . both parents are immature, hedonistic, irresponsible, and not reliable as caretakers for themselves or for others. They do not have a satisfactory domicile, a reliable source of income, nor the habits and attitudes that are sufficient for independent existence and for the establishment of a satisfactory family life. Their drug rehabilitation is of recent origin and not yet stabilized.
(State's Exh. B., p. 8)
Reunification according to Dr. Mantell could only be considered if the parents established one year "of sobriety, of gainful employment, and of a healthy pattern of interaction with the child including a capacity to bond with the child and the child to bond with them." (Id.) In the two and a half months following the making of this recommendation, neither parent had established a stable home, found work, or engaged in any kind of drug treatment. John had not visited at all and Jean only twice.
Conclusions of Fact:
1. Both parents have used drugs for nearly a decade, accelerating to intravenous injection of cocaine in the years preceding Valerie's birth.
2. Drug use did not implicate the birth of their first child, Amanda, in May of 1988 and no referrals for neglect were received by DCYS until their arrest in June of 1989. since Amanda's placement in the custody of DCYS at that time, however, they have done nothing in terms of drug treatment, CT Page 178 securing a stable home or employment, or maintenance of regular visitation with her that would support any reasonable expectation of an early reunification with that child.
3. Jean did not seek prenatal care until she was five months pregnant with Valerie. After an initial visit with an obstetrician at that time, she did not return for prenatal care until her eighth month when she kept a single clinic visit. Thereafter the pregnancy was not again monitored until a visit immediately prior to birth.
4. Although able to curb her use of cocaine during her first pregnancy, Jean was unable to do so when pregnant with Valerie and, despite repeated warnings from various professionals, did not seek drug treatment prior to Valerie's birth.
5. Jean injected cocaine intravenously after going into active labor with Valerie. Stress from cocaine use at this stage precipitated the birth resulting in the baby's aspiration of meconium which only drastic and aggressive suctioning during the birth process prevented from fatality.
6. Valerie has suffered numerous health problems since birth, including withdrawal symptoms, impeded breathing, pneumonia and repeated hospitalizations. Jean expressed doubt as to the withdrawal since she had personally never observed these symptoms during her infrequent visitation.
7. During the two and a half months during which trial of this matter was conducted, the father did not visit the child once; the mother only three times.
8. In the five months between the date when the parents admitted to the neglect of Amanda and agreed to expectations leading to her return (securing a home and lawful source of income, engaging in sustained drug treatment, maintaining regular visitation) neither parent has consistently complied with any of these expectations. John completed a short-term inpatient program but has not followed through with recommended outpatient treatment; Jean refused inpatient treatment and dropped out of intensive day treatment after only five sessions, having tested positive for cocaine on the fifth occasion.
9. Cocaine babies are at risk for years of physical, neurological and intellectual problems, and need an extra-ordinarily sensitive degree of responsive, consistent, stable parenting. CT Page 179
10. The probability that either parent can maintain sobriety long enough to assume care of this baby is less than 50% based upon their long histories of increasingly serious drug abuse and their failure to sustain any drug treatment program, even when expecting their children. For addicts who do sustain treatment, the recidivist rate is about 50%; for users of intravenous cocaine, it is about 70%. For those who do not continue in treatment, the likelihood of return to drug abuse is still higher.
11. The parents presumably formed a bond with Amanda whose care they had for the first 13 months of her life. If they prove able to rehabilitate, their first obligation will be to resume Amanda's care and demonstrate with her that the burdens of child care do not deflect them from their rehabilitation. Valerie could not be added to their responsibilities until this has been demonstrated for a significant period of time. This process — demonstrated rehabilitation and ability to sustain it after return of Amanda — will take years which Valerie cannot afford to wait absent some "compelling need".
12. Despite the complications caused by her mother's use of cocaine during pregnancy, Valerie is an adoptable baby. There is no compelling need for her to wait years for a permanent home.
4. Adjudication — neglect/uncared-for petition (as of 11/8/89)
This record provides proof by a preponderance of evidence that Valerie at the time this petition was last amended, was both uncared-for and neglected:
 (a) Uncared-for: Specialized needs. Any infant, dependent for everything needed for existence, is a child with specialized needs. In Re Carl O., 10 Conn. App. 428
(1987). A cocaine baby's needs are even more exacting. Valerie's parents have admitted to Dr. Mantell that as of the date of evaluation (11/2/89) they were not able to care for Valerie and would not expect to be for at least another year.
 (b) Uncared-for: Homeless. Neither parent, as of the adjudicatory date, had homes for themselves, much less for an infant. Furthermore, even if they had secured an apartment, the child would continue to CT Page 180 be homeless until such time as either parent demonstrated an ability to provide consistent, stable, responsible nurture to an infant. Home for a baby does not equate with "house". Children need not only adequate physical space but also, within that space, a caretaker reasonably predicted to be able to provide adequate physical and emotional care. So long as either of Valerie's parents is abusing drugs and refusing ongoing treatment, they cannot be such caretaker. Without treatment, only a long period of time — at least one year — of sobriety coupled with stability of location, employment and relationships could support consideration of returning this child to their care.
 (c) Neglected: Abused. Valerie fits within every definition of abuse found in subsection (b) of Sec. 1 — 38a: She has had physical injury inflicted upon her by a person responsible for her health, welfare or care. The fact that Jean injected cocaine eight hours before her birth rather than eight hours after is irrelevant; her act in introducing cocaine into the bloodstream of an infant about to be born is just as much abuse as if she had done so immediately after birth. Valerie's condition at the moment of birth was the direct result of maltreatment.
 (d) Neglected: Denial of proper care and attention. Failure of the parents to seek and pursue prenatal care, ignoring repeated warnings as to the detriment to the unborn of maternal drug abuse, the continued use of injected cocaine throughout the pregnancy, and, finally, the intravenous injection of cocaine into the bloodstream of the mother (with, presumably, the assistance of the father) after initiation of labor, resulted in a tangible denial of proper care and attention physically and, projected into the future, educationally and emotionally as well. In her first few months of life, Valerie had to undergo hourly sunctioning, was repeatedly hospitalized, contracted pneumonia. Current studies on "cocaine babies" suggest neurological, intellectual and emotional deficits directly ascribable to maternal cocaine use during pregnancy may be anticipated as they grow older.
The fact that the act resulting in the detriment to the child occurred prior to birth does not require the conclusion that the child's condition at birth was other than that of a neglected child. In many other jurisdictions, petitions alleging neglect because of a mother's drug abuse during pregnancy have been upheld. Matter of Baby X., 97 Mich. App. 111 (1980); In re Ruiz 500 N.E.2d 935, 27 Ohio Misc.2d 31 (Ohio Com. Pl., CT Page 181 1986); Matter of Troy D., 215 Cal.App. 3rd 889 (Cal.App. 1/31/90). In the latter case the court found neglect not only because of the child's impaired condition at birth caused by the mother's drug abuse during pregnancy, but also found that such abuse is probative of future child neglect.
 The issue in prospective neglect or abuse cases is whether future behavior, which will adversely affect the child, can be clearly and certainly predicted. If the parent is so afflicted that no reasonable basis exists for improvement, then courts may find prospective neglect or abuse.
Palmer v. Dept. of Human and Rehab. Services, 437 So.2d 981
(Fla.App. 1989). In a recent ruling of the Appellate Division (First Dept.) in New York, it was found to be error for the trial court to dismiss on the pleadings a a petition alleging neglect based upon drug use during pregnancy on the sole ground that prenatal conduct cannot form the basis for an adjudication of neglect. In the cases of Stefanel Tyesha C. and Sebastian M. (203 N.Y. Law Journal #104, pp. 21-24, 5/31/90) the Appellate Division reversed, holding that such petitions "sufficiently alleged causes of action for neglect based on the mothers' admitted use of drugs during their pregnancies, the childrens' positive toxicology for cocaine at birth and the failure of the mothers to be enrolled in a drug rehabilitation program at the time the petitions were filed." (Decision of Rosenberger, J. for a unanimous five-justice panel, decided 5/20/90. Appendix B.) In the instant case, the facts are even more compelling: Valerie almost died as a direct result of the mother's injection of cocaine after labor had begun.
5. Adjudication — termination petition (as of 11/8/90).
(a) Denial by acts of parental commission or omission the care guidance or control necessary for physical, educational and emotional well-being. (Ground #2, Sec. 45-61f(f).) The facts underlying the finding of abuse above, support by clear and convincing evidence this ground for terminating her parents' rights. Ground #2 specifically provides that "Nonaccidental. . . serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights." Valerie suffered serious, life-threatening, physical injury at the instant of her birth because of her mother's deliberate intravenous injection of cocaine after beginning labor. This ground would apply without question to parents who, an instant after birth, injected cocaine into the bloodstream of a newborn. The injection of the drug into the bloodstream of a baby CT Page 182 about to be born should have no different consequences. The apparent requirement that this ground shall have existed for 12 months before termination may be granted seems to have been inserted in the statute inadvertently (See Appendix A.) If it is deemed to apply, however, it clearly must be waived in these circumstances since it is found "from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." Parents whose drug problems are so serious as to result in the injection of cocaine during labor, to the child's clear detriment, would have to engage in consistent drug treatment for at least one year while visiting the child regularly before she could be considered for return. Under all of the circumstances of this case, including the failure of the parents to engage in either such treatment or regular visitation during the months this matter was pending in court, requiring Valerie to wait still longer for permanency would clearly be inconsistent with her best interests.
(b) Abandonment — In the three months between the filing of these petitions and the adjudicatory date, neither parent appeared to maintain "a reasonable degree of interest, concern or responsibility as to the welfare of the child", the definition of abandonment found in subsection (f) of Sec. 45-61f. Valerie had been placed for three weeks in foster care before the parents' first request to visit. They were provided with the CT Page 183 foster parents' address and telephone number and were permitted to make their own arrangements for visiting. After an initial visit on 8/30/89, when both parents and maternal grandmother visited, no future date was set, the parents agreeing to call for the next visit. Their next contact was not until 9/8/89 when the baby was hospitalized for the second time in a matter of days with pneumonia. Although the child remained hospitalized for ten more days — during which the foster mother "practically lived" at the hospital — neither parent returned, although the grandmother came back three more times. The next time Jean called the foster mother to inquire of the baby's health was on 10/10/89 — more than a month after her hospital visit. A date to visit was set for 10/19/89. Jean and her mother came on that occasion — the same date, incidentally, that her drug program detected cocaine in her urine. Jean visited four more times in October, but did not see the child again between a visit on November 1 and the next visit on December 8. The only times John visited were August 30 and October 30. During this time neither parent engaged in any consistent drug treatment, the precondition they agreed was necessary before resuming care of any child. This pattern, however, does not constitute clear and convincing proof sufficient to terminate parental rights. Further, the circumstances surrounding parental visitation do not so clearly require a waiver of nine of the 12 months that have always applied to this ground for termination. Certainly six visits in less than two weeks (between October 19 and November 11), if maintained, would have been an adequate manifestation of interest by the mother. Equally certainly the infrequent contact during the child's hazardous first two months out of the hospital following birth, if maintained, would have been an inadequate manifestation of interest sufficient to support termination of parental rights. This pattern is too erratic and the period too short for the waiver of nine of the requisite 12 months. This ground is, therefore, dismissed.
(c) Parent-Child Relationship. Dr. Mantell's observations confirmed what a lay trier of fact could conclude about the nature of the relationship existing between Valerie and her parents on November 8, 1989. He saw no sign of bonding on November 1 and 2, and indeed, the parents of a newborn who had only seen the child a handful of times in the first three months of life could not have developed the kind of relationship that results from ". . . a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child," as described in grounds (3) of Sec. 45-61f(f). That alone, however, is not grounds to terminate a parent's rights. Where, however, the facts support a further conclusion that "to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interests of the child," termination may CT Page 184 be ordered. There can be no question that a minimum of one year of freedom from drug abuse would have to precede any consideration of reunification of Valerie with her parents. The reluctance of both to enter or remain in drug treatment for any significant period of time combined with their individual psychological problems — apart from drugs — that rendered them both chronically jobless and homeless makes it highly improbable that even a year from the adjudicatory date either would be in a position to provide the kind of care that this child will need at that stage in her life. To wait a year for a probably un-favorable outcome for a fragile infant whose need for permanency is secondary only to her need for adequate physical care would be clearly and convincingly detrimental to her well-being. The petitioner has, therefore, established by the requisite standard of proof the second ground for terminating the rights of the respondent parents. Waiver of the 12 months for this particular ground, if even applicable (see Appendix A), is required by all of the surrounding circumstances for the same reasons that apply to the first ground found — acts of commission and omission.
6. Disposition — both petitions, as of 2/21/90
In the three months between the adjudicatory date (11/8/90) and the dispositional date (last day of trial: 2/21/90) Jean visited on December 8 and 17, 1989 and on January 13 and February 16, 1990. John did not visit. Neither parent was in drug treatment. Jean had found a job in early December but lost it on January 17. The reason given (testimony of Jean D. 2/21/90) was that she missed too much time from work due to court appearances. (She had a single court appearance, on December 13, between early December and 1/17/90, the day she left her job.) She then had a part time job for three weeks and at the time of testifying had been working as a waitress for a week. Although on two years probation conditioned upon counselling and random urine testing, Jean was engaged in neither. John had worked a few days for one employer but quit before he could be fired for missing work for court dates. He explained his failure to follow through after a three-week inpatient drug program as due to lack of insurance, but gave no reason why he failed to secure Title XIX coverage for which a long-unemployed person might be eligible. At the time of testifying (2/21/90) John was living with a friend, was forbidden to drive as a condition of his probation, had spent two brief periods in jail in the preceding two months. Both parents voiced their intention of resuming their life together and both minimized the impact of maternal drug use on unborn children: When asked what she had learned from the repeated warnings of the obstetrician and DCYS workers about such impact, she replied "Nothing majorly in detail." She confirmed being repeatedly advised by social workers to seek drug treatment but CT Page 185 found it too confusing with her arrest, removal of Amanda, and impending birth of Valerie but said, defensively "Half the time they don't know what's going on either." She admitted she had called the doctor after her water broke, and then injected cocaine before going to the hospital because "I really didn't realize it would do such damage." John admitted knowing that Jean could do serious damage to their unborn child, but thought "You had to do a lot before the kid would be hurt."
Before considering terminating a parent's rights, the court must consider the six factors set forth in subsection (h) of Sec. 45-61f: (1) The only services that could have been offered to parents in these circumstances were referral to drug treatment resources and the facilitation of visitation. Both were offered: Suggestions for drug treatment resources were made repeatedly to both parents by a number of different professionals. The foster parents' address and telephone number were provided and the parents invited to make their own arrangements, as often as they liked. Neither parent ever requested assistance with transportation, although the foster mother offered to assist if they had arrived by bus. Maternal grandmother was always available to drive Jean. Conflict between her and John made that source of transportation unavailable to him for part of this period, but DCYS offered to provide bus money for his visitation. (Testimony of social worker Dayner, 2/21/90). Notwithstanding these offers of assistance, John had only visited three times in the six months between the child's placement in foster care and the dispositional date; Jean eleven.
(2) No court orders were entered into in this matter except to attend court and evaluation sessions. Neither parent came to court on 3/28/90 to hear the rendering of the court's decision in the case. Judicial notice is taken of the fact that in the eight months since Amanda was placed on DCYS custody, neither parent has adhered to the court's articulated expectations for her return to their care: Drug treatment; regular visitation; adequate housing.
(3) A child as young as Valerie can have no emotional ties with parents seen so infrequently in the first seven months of her life, and no one has had her guardianship for at least one year.
(4) Valerie was seven months old on the dispositional date. All of this time has been spent in foster care. Cocaine babies need an extraordinary degree of secure and responsive parenting, and the sooner she is assured permanent placement in a home that will provide it, the more likely she will be to maximize whatever potential she may have to develop normally. CT Page 186
(5) Neither parent has made any lasting effort to adjust circumstances, conduct or conditions to make it in Valerie's best interests to return to their home (or homes) in the forseeable future: They have maintained only erratic and infrequent contact; they have not engaged in drug treatment, and consequently are in danger of violating the conditions of their release from prison; they are both homeless and jobless.
(6) No one has prevented them from maintaining a meaningful relationship with the child. While the foster home was 10 miles from the town in which the parents lived, such placement was not unreasonable considering the nature of the baby's needs upon discharge from the hospital. Jean had access to transportation to the foster home through her mother (who visited on a number of occasions when Jean did not), and John was offered financial assistance in covering these 10 miles which was never utilized.
Considering the foregoing factors, as well as the recommendation of the evaluating psychologist for Valerie to be placed in a permanent home without the year or longer delay attendant upon any plan to place her with her biological parents it is FOUND, by clear and convincing proof, to be in the best interests of Valerie M. to be placed forthwith in the security of adoption.
Therefore it is ORDERED that the parental rights of Jean D. and John M. in their daughter Valerie M. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the said child forthwith in adoption and that such Commissioner shall submit in writing not later than 90 days from the date of this judgment a report as to the progress toward such adoption. This disposition, including as it does both custody and guardianship as well as conferring all residual parental rights including the right to enter into adoption agreements, disposes of the neglect petition as well as of the coterminously filed petition. If the appeal that Jean has taken has not been finally resolved by 6/28/91, the said Commissioner is further ORDERED to file a Motion to Review Plan for Terminated Child, as required by federal guidelines, by that date.
Entered at Plainville this 24th day of July 1990
BRENNEMAN, JUDGE
APPENDIX A
 Legislative history of the one-year requirement for grounds to terminate parental rights. CT Page 187
The Superior Court, sitting on petitions coterminously filed under subsection (e) of Sec. 17-43a, is required to act under the provisions of Sec. 45-61f applicable to children not previously committed to the state. An examination of the legislative history of Connecticut's two termination statutes makes clear that the one-year requirement in Sec. 45 61f was never intended to apply to any nonconsensual ground for terminating a parent's rights other than abandonment.
The original legislation conferring on the probate court's jurisdiction to terminate parental rights and on the then Juvenile Court jurisdiction to hear simultaneously filed neglect and termination petitions, P.A. 73-156, imposed the one-year requirement on all nonconsensual grounds as had historically existed in Juvenile Court affecting rights of parents of previously committed children. The following year, among many amendments to the original legislation effected by P.A. 74-164, the location of the one-year requirement was moved so that it applied to abandonment only. In explaining the intent of the amendments, the Probate Court Administrator, who had chaired the task force which had proposed the original 1973 legislation, testified that the 1974 changes were intended to permit the Juvenile court ". . . . to terminate the parental rights using the same standards as the probate court on a child committed to the welfare commissioner WITHOUT WAITING THE YEAR REQUIRED UNDER THE OLD STATUTE." (Hearing, March 19, 1974, p. 195. Emphasis added.) As enacted, however, the one-year requirement was retained in Sec. 17-43a for petitions concerning children previously committed to the state (Sec. 3 of P.A. 74-164) but eliminated for all other termination petitions originating in either court, except where abandonment was alleged.
Changes made in these statutes nearly every year thereafter left unchanged the distinction between termination petitions affecting committed children, for which the one-year requirement continued to apply, and those affecting children not previously committed, for which the one-year requirement was confined to abandonment.
In 1983, however, in P.A. 83-478, the legislature for the first time added to the "acts of commission and omission" ground the second sentence now found there:
 Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental CT Page 188 rights.
At the same time, in an apparent effort to erase the differences between the two statutes despite the very different contexts to which they applied, the one-year requirement was again moved to a position where, as in Sec. 17-43a, it became equally applicable to all of the nonconsensual grounds. When presented to the House of Representatives as Amendment A to the 1983 legislation, there was no discussion or apparent consideration of the impact of applying the one-year requirement to all of the the grounds in Sec. 45-61f, including the important addition of "serious physical injury" as prima facie ground, encompassed within "acts of commission or omission," sufficient alone to terminate a parent's rights. The only hint in the legislative history that anyone even considered the impact of this change (other than to achieve the beauty of symmetry between the two statutes) was a letter to the Judiciary Committee from a spokesperson from the Legal Services Training and Advocacy Project dated May 11, 1983 opposing the suggestion that had been made that the one-year requirement be deleted from all termination laws. He added, in passing, that the requirement should, instead, be added to Sec. 45-61f so as to give all parents the opportunity to rehabilitate before any court could terminate their rights. Two weeks later this suggestion was introduced to the House of Representatives, without discussion, as a "technical amendment" and passed without debate. (Journal of the House, May 25, 1983, p. 272.) This and all other changes enacted by P.A. 83-478 were inadvertently repealed by Sec. 2 of P.A. 83-11 (June Special Session) and reenacted without debate by Sec. 6 of P.A. 84-171 the following year.
This legislative history shows a conscious intent in 1974 to limit the one-year requirement to abandonment only, but appears to be an inadvertent restoration of the requirement to all of the other grounds as a "technical amendment" nine years later.