IN RE RUIZ, ALLEGED ABUSED CHILD. ▮

(No. 14774 — Decided August 27, 1986.)

Court of Common Pleas of Wood County, Juvenile Division.

*Linda Holmes,* assistant prosecuting attorney, for prosecution.

*Richard Neller,* for natural parents.

*Jeffrey Nelson,* guardian ad litem.

POLLEX, J. This proceeding was commenced pursuant to R.C. 2151.031. The issue presented has yet to be decided in this state. The ultimate question is whether a finding that a child is abused may be predicated solely upon the prenatal conduct of the mother. In order to determine this question, it is

necessary to review the status of an unborn fetus as a "child" under the child abuse statute alleged in the complaint.

R.C. 2151.031 states that an abused child includes any child who:

"(B) Is endangered as defined in section 2919.22 of the Revised Code, except that the court need not find that any person has been convicted under that section in order to find that the child is an abused child."

R.C. 2919.22(A) prohibits any parent or guardian from creating "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

Luciano Ruiz was born December 31, 1985 to Nora Ruiz and Luciano Garcia. Luciano Ruiz, the baby, was estimated to be at thirty-five weeks' gestation at birth (mildly premature), and somewhat undergrown for his age. It was brought to the attention of the treating physician that the mother was a self-admitted heroin addict and had used heroin intravenously at least in the last two weeks prior to delivery.

Baby Luciano's urine screen tested positive for cocaine and opiates (heroin). This finding led to the diagnosis of neonatal drug withdrawal, which indicated in-utero exposure to such drugs. Several symptoms exhibited by Luciano included irritability, pronounced jitteriness, hypertonicity, diarrhea, and initial feeding difficulty with regurgitation of food.

Treatment with phenobarbital has been effective in managing the irritability, jitteriness, and feeding problems; however, the hypertonicity and some tremoring and irritability still persisted after ten days.

This court on January 14, 1986 ordered an immediate pick-up of the child by the Wood County Department of Human Services since there was no parent, guardian or custodian suitable, at that time, to provide supervision and care to serve the child's needs. On March 7, 1986, a comprehensive reunification plan was prepared and filed by the Department of Human Services, and no objections were received. As a result of the reunification plan, the parents were to participate in parental training, and Nora was to actively participate in drug counseling and refrain from any drug usage. A parent-child visitation schedule was also outlined in the plan. Subsequent reports from the Substance Abuse Service and the Department of Human Services indicated to this court that Ms. Ruiz had missed several appointments.

R.C. 2151.011(B)(1) defines "child" as "a person who is under the age of eighteen years * * *." A review of the common law and Ohio case law treatment of the rights afforded to unborn children will help to put the issues with which we are dealing into focus.

Common law typically bestowed legal protection at birth. It was because then, and only then, that the fetus was considered to be capable of surviving independently of the mother. Justice Holmes reasoned in *Dietrich* v. *Inhabitants of Northampton* (1884), 138 Mass. 14, 17, 52 Am. Rep. 242, 245, that "as the unborn child was a part of the mother at the time of the injury, any damage to it which was not too remote to be recovered for at all was recoverable by" the mother.

The development from the common law reflects a growing social awareness of the individuality of the unborn. The first victory for the unborn in Ohio was centered around the issue of whether a child who was injured prenatally should be afforded a cause of action guaranteed to all "persons" under Section 16, Article I of the Ohio Constitution, which provides:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

In *Williams* v. *Marion Rapid Transit, Inc.* (1949), 152 Ohio St. 114, at 128-129 [39 O.O. 433], the court reasoned that to deny the infant, who was injured while a viable unborn child, a cause of action and accept the "time-worn fiction" adhered to since *Dietrich,* which is known to be "untrue and unjustified," would require the court to announce that as a matter of law the infant is a part of the mother until birth and has no existence in law until that time. The court could not do this and held at paragraph two of the syllabus that prenatal injuries inflicted on the unborn child are injuries " 'done him in his * * * person.' "

The departure from the common law continued when the court considered whether or not a wrongful death action could be brought as a result of injuries to an unborn fetus. In *Jasinsky* v. *Potts* (1950), 153 Ohio St. 529 [42 O.O. 9], the court found that a wrongful death action would lie if the child was born alive, but died shortly thereafter. The court seemed to hesitate on the issue of whether such an action would lie if the child was not subsequently born alive, but did not rule on that question since it was not before it.

In *Stidam* v. *Ashmore* (1959), 109 Ohio App. 431 [11 O.O.2d 383], the court held that a wrongful death action did exist, even if the viable fetus was stillborn. The court reasoned that such a distinction, to be born alive, even if only momentarily, could lead to bizarre results. The motion to certify the record of this case was dismissed by agreement of the parties. Despite the *Stidam* holding, it was still thought that such an action would not exist (see *Dickinson, infra*).

Recently the Supreme Court held in *Werling* v. *Sandy* (1985), 17 Ohio St. 3d 45, 48 that:

" * * * a cause of action may arise under the wrongful death statute when a viable fetus is stillborn since a life capable of independent existence has expired. It is logically indefensible as well as unjust to deny an action where the child is stillborn, and yet permit the action where the child survives birth but only for a short period of time."

Such a holding clearly indicates that an unborn child is entitled to legal protection when his life has been interfered with by another, whether the child is subsequently born alive or still.

A third issue that has been debated, concerning the status of an unborn fetus, deals with criminal statutes: Is an unborn fetus considered a person under Ohio's homicide statutes? In *State* v. *Dickinson* (1971), 28 Ohio St. 2d 65 [57 O.O.2d 255], the court held that an unborn fetus was not. The court reasoned that the legislature easily could have included an unborn fetus in the statutes, or in one of their numerous amendments, since they were aware of the possible harsh results. They concluded that as a court they were under a duty to strictly construe all criminal statutes against the state.

Unborn children have been given rights in several Ohio statutes. R.C. 2105.14 recognizes a posthumous child's intestate rights. R.C. 2131.08(A) allows a child in gestation who is subsequently born alive to be considered a life in being throughout the gestation period for purposes of the rule against perpetuities. And under the Uniform Parentage Act, the personal representative of an unborn child may bring an action on behalf of the infant to establish a father-child relationship. R.C. 3111.04.

The *Dickinson* court noted its participation in the movement to give viable fetuses certain rights. Part of the court's explanation in denying the "person" status to the unborn fetus, for criminal proceeding purposes, was that "even in the civil area, this court has not held that an infant, that does not survive independent of the mother for some period of time, has a cause of action." *Id.* at 70. This holding was after *Stidam* but before *Werling.* The question now

arises as to the weight *Werling* would have in the court's further consideration of the status of an unborn as a person. Should the court complete or perfect its viability reasoning and award full "person-child" rights at the time of viability? Such a question is beyond the scope of this case and will be left for the scholars to debate. But in the meantime, it must be determined whether an unborn fetus may, at least, be considered a child under the child abuse statute.

The United States Supreme Court held in *Roe* v. *Wade* (1973), 410 U.S. 113, at 162, that a state acquires a compelling interest in the potential human life of the fetus at the moment the fetus becomes viable.

"With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justification." *Id.* at 163.

After viability, the state may absolutely prohibit the fetus from being aborted, unless the mother's life is threatened because of the fetus.

The essence of *Roe*, the state's interest in the potential human life at the time of viability, in conjunction with Ohio's developing case law, compels a holding that a viable unborn fetus is to be considered a child under the provisions of R.C. 2151.031. Such a holding is in line with the purposes iterated at the outset of R.C. Chapter 2151:

"(A) To provide for the care, protection and mental and physical development of children * * *."

Professor Myers argues in Abuse and Neglect of the Unborn: Can the State Intervene? (1984), 23 Duq. L. Rev. 1, at 29, that:

"The important state interests in preservation of life, the potentiality of life, and child welfare lend resolute support to the argument that child abuse and neglect statutes should include unborn children. In reality, this is the only way to give meaningful effect to those interests. An interest stripped of a method of enforcement is a feckless thing. Nowhere in law are significant state interests unaccompanied by a means of implementation. This is certainly true where the state seeks to prevent death or serious bodily injury. The only reasonable mechanism to implement state interests in the unborn is through existing abuse and neglect statutes. [Footnote omitted.] Since these statutes can be construed to include the unborn, protection of legitimate state interests calls for such an interpretation. * * * Doing so will nourish important state interests, and extend long overdue legal protection to the unborn."

Such a holding does not conflict with the *Dickinson* rule for homicide or its general principle that criminal statutes must be construed strictly. R.C. 2151.031 is not a criminal statute. And the child endangering provision specifies that there need not be a conviction under R.C. 2919.22 in order to find that a child is abused.

Birth was traditionally the point at which the fetus was entitled to full legal protection of its interests because birth was then synonymous with viability. Now the concepts are distinct and courts have begun to abandon birth as the central criterion. Viability has come to be understood as the level of developmental maturity at which a fetus will continue to live and develop even if physically separated from its mother. Professor King argues in The Juridical Status of the Fetus: A Proposal for Legal Protection of the Unborn (1979), 77 Mich. L. Rev. 1647, that at every level of human development the person is entitled to certain protections. And it is at viability that principal rights, including the protection of viable unborn children's in-

terest in life, free from harm, should be bestowed.

From the holdings of *Roe* and *Werling*, it is logical to conclude that at the time of viability, the state has an interest in the "child's" care, protection, and physical and mental development.

At least two other courts have considered and agreed with this proposition. *In the Matter of Baby X* (1980), 97 Mich. App. 111, 293 N.W. 2d 736, where the child exhibited signs of drug withdrawal twenty-four hours after birth, the state petitioned the court to take temporary custody because of the mother's neglect of her child. The court discussed the question of whether a mother's prenatal behavior is relevant to a determination of the newly born child's neglect. It concluded at 115 that since a child "has a legal right to begin life with a sound mind and body," *Womack* v. *Burhhorn* (1971), 384 Mich. 718, 187 N.W. 2d 218, it is within the best interest of the child to examine all prenatal conduct bearing on that right:

"We hold that a newborn suffering narcotics withdrawal symptoms as a consequence of prenatal maternal drug addiction, may properly be considered a neglected child within the jurisdiction of the probate court. We pass no judgment upon whether such conduct will suffice to permanently deprive a mother of custody. Such custody determination will be resolved at the dispositional phase where prenatal conduct will be considered along with postnatal conduct." *Baby X* at 116, 293 N.W. 2d at 739.

In *In the Matter of Smith* (1985), 128 Misc. 2d 976, 492 N.Y. Supp. 2d 331, that court determined at 979, 492 N.Y. Supp. 2d at 334, that a mother who refused to seek treatment of her alcohol abuse or to seek proper medical care for her unborn child was "sufficient to establish an 'imminent danger' of impairment of physical condition, including the possibility of fetal alcohol syndrome, to the unborn child," and therefore the child was neglected. It must be noted that the New York court relied on a rule of law which allows the court to presume that a child of a person who repeatedly uses alcohol to an extent of impairment of judgment is a neglected child. The presumption may be rebutted by showing the fact of enrollment in a recognized rehabilitative program.

In light of the foregoing analysis of the developing body of law, this court is in agreement with its sister courts in holding that a child does have a right to begin life with a sound mind and body, and is compelled to hold that a viable fetus is a child under the existing child abuse statute, and harm to it may be considered abuse under R.C. 2151.031.

R.C. 2151.031 defines an abused child as one who is endangered as defined in R.C. 2919.22. Under the endangering section referred to therein it reads as follows:

"(A) No person who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to health or safety of the child, by violating a duty of care, protection, or support * * *."

The court herein finds that R.C. 2919.22(A) as quoted above applies to this case. Clearly the natural mother in using heroin so close to the birth of this child did create a substantial risk to the health of said child as defined in said section. Accordingly, the court reaches the inescapable conclusion that the allegations of the complaint alleging that the child was abused have been established.

*Judgment accordingly.*