602 So.2d 1288 (1992)
Jennifer Clarice JOHNSON, Petitioner,
v.
STATE of Florida, Respondent.
No. 77831.
Supreme Court of Florida.
July 23, 1992.
*1289 Louise F. Melling and Eric Lieberman of Rabinowitz, Boudin, Standard, Krinsky & Lieberman, for The Nat. Emergency Civ. Liberties Committee, Lynn M. Paltrow, for American Civ. Liberties Union Foundation, New York City, James Sweeting, III, Orlando, and James K. Green for American Civ. Liberties Union Foundation of Florida, Inc., West Palm Beach, for petitioner.
Robert A. Butterworth, Atty. Gen. and Belle B. Turner, Asst. Atty. Gen., Daytona Beach, for respondent.
Stephan E. Lawton and Thomas N. Bulleit, Jr. of Hogan & Hartson, Washington, D.C., David Orentlicher, for American Medical Ass'n, Chicago, Ill., and John E. Thrasher for Florida Medical Ass'n, Inc., Jacksonville, amicus curiae for The American Medical Ass'n, The American Academy of Pediatrics, The American College of Obstetricians and Gynecologists, and The Florida Medical Ass'n.
Nadine Taub, Rutgers University, School of Law, Newark, N.J., and Jerri Blair of Lockett & Blair, P.A., Tavares, amici curiae for The American Public Health Ass'n, The American Medical Women's Ass'n, Inc., The American Nurses Ass'n, The American Society of Addiction Medicine, The American Society of Law & Medicine, The Ass'n of Maternal and Child Health Programs, The Bucks County Council on Alcoholism and Drug Dependence, The Center for Law and Social Policy, The Center for Science in the Public Interest, The Coalition on Alcohol and Drug Dependent Women, The Drug Policy Foundation, The Florida Chapter of the Nat. Organization for Women, The Florida Feminist Task Force, The Florida Nursing Students' Ass'n, The Illinois Alcoholism and Drug Dependence Ass'n, The Legal Action Center, The Louisiana Coalition for Maternal and Infant Health, The Mariposa Women's Center, The Monroe County Coalition for Choice, The Nat. Abortion Rights Action League, The Nat. Ass'n of Alcoholism and Drug Abuse Counselors, The Nat. Ass'n of Social Workers, The Nat. Black Women's Health Project, The Nat. Council on Alcoholism and Drug Dependence, The Nat. Council of Negro Women, Inc., The Nat. Latina Health Project, The Nat. Lawyers Guild, Southern Region, The Nat. Perinatal Ass'n, The Nat. Women's Health Network, Project Healthy Choices, The Winter Park Area Chapter of The Nat. Organization for Women (Winter Park Area NOW), and The Women's Legal Defense Fund.
Wendy K. Mariner, Boston, Mass., and Jary C. Nixon, Tampa, amicus curiae for The American Soc. of Law and Medicine.
Charlene Miller Carres, Tallahassee, amicus curiae for A Group of Florida legislators.
Dawn Euringer of Hayden & Milliken, P.A., Peggy Fisher, Barbara Greenof Freidin, Hirsh, Green & Gerrard, P.A., Marisa Tinkler Mendez of Black & Furci, P.A., Sally Richardson of Shutts & Bowen, Miami, and Jill Traina, Coral Gables, amicus curiae for Florida Ass'n for Women Lawyers, Dade County Chapter, Inc.
Alison B. Marshall of Miller, Canfield, Paddock and Stone, Washington, D.C., amicus curiae for Nat. Ass'n for Perinatal Addiction Research and Educ. (NAPARE).
*1290 HARDING, Justice.
We have for review Johnson v. State, 578 So.2d 419, 420 (Fla. 5th DCA 1991), in which the Fifth District Court of Appeal certified the following question as one of great public importance:
WHETHER THE INGESTION OF A CONTROLLED SUBSTANCE BY A MOTHER WHO KNOWS THE SUBSTANCE WILL PASS TO HER CHILD AFTER BIRTH IS A VIOLATION OF FLORIDA LAW?
Our jurisdiction is based on article V, section 3(b)(4) of the Florida Constitution, and we answer the certified question in the negative.
The issue before the court is whether section 893.13(1)(c)(1), Florida Statutes (1989), permits the criminal prosecution of a mother, who ingested a controlled substance prior to giving birth, for delivery of a controlled substance to the infant during the thirty to ninety seconds following the infant's birth, but before the umbilical cord is severed.
Johnson presents four arguments attacking the applicability of section 893.13(1)(c)(1) to her conviction: 1) the district court's interpretation of the statute violates the legislature's intent; 2) the plain language of the statute prevents her conviction; 3) the conviction violates her constitutional rights of due process and privacy; and 4) the State presented insufficient evidence to show that she intentionally delivered cocaine to a minor. The Court received amicus briefs on Johnson's behalf from the American Medical Association, the American Public Health Association, the American Society of Law and Medicine, a group of Florida legislators, the Florida Association of Women Lawyers, and the National Association for Perinatal Addiction Resources and Education. The State contends that the district court correctly found that the statute's plain language prohibits the delivery of the controlled substance to a minor, and that the conviction does not violate Johnson's constitutional rights.
We adopt Judge Sharp's analysis concerning the insufficiency of the evidence to support Johnson's conviction and her analysis concerning the legislature's intent in section 893.13(1)(c)(1). However, we note that Judge Sharp's analysis did not clearly state the rules of statutory construction in the criminal context. Although Judge Sharp correctly applied the rule of strict construction, she failed to apply the other paramount rule of criminal statutory construction, the rule of lenity. § 775.021(1), Fla. Stat. (1989).
The rules of statutory construction require courts to strictly construe criminal statutes, and that "when the language is susceptible to differing constructions, [the statute] shall be construed most favorably to the accused." § 775.021(1). In strictly construing criminal statutes, we have held that only those terms which are "`clearly and intelligently described in [a penal statute's] very words, as well as manifestly intended by the Legislature'" are to be considered as included in the statute. State v. Wershow, 343 So.2d 605, 608 (Fla. 1977), quoting Ex parte Amos, 93 Fla. 5, 112 So. 289 (1927). We find that the legislative history does not show a manifest intent to use the word "delivery" in the context of criminally prosecuting mothers for delivery of a controlled substance to a minor by way of the umbilical cord. This lack of legislative intent coupled with uncertainty that the term "delivery" applies to the facts of the instant case, compels this Court to construe the statute in favor of Johnson. The text of Judge Sharp's dissent is as follows:
Johnson appeals from two convictions for delivering a controlled substance to her two minor children in violation of section 893.13(1)(c)1., Florida Statutes (1989).[1] The *1291 state's theory of the case was that Johnson "delivered" cocaine or a derivative of the drug to her two children via blood flowing through the children's umbilical cords in the sixty-to-ninety second period after they were expelled from her birth canal but before their cords were severed. The application of this statute to this concept of "delivery" presents a case of first impression in this state. Because I conclude that section 893.13(1)(c)1. was not intended to apply to these facts, I would vacate the convictions and remand for the entry of a judgment of acquittal.
The record in this case establishes the following facts. On October 3, 1987, Johnson delivered a son. The birth was normal with no complications. There was no evidence of fetal distress either within the womb or during the delivery. About one and one-half minutes elapsed from the time the son's head emerged from his mother's birth canal to the time he was placed on her stomach and the cord was clamped.
The obstetrician who delivered Johnson's son testified he presumed that the umbilical cord was functioning normally and that it was delivering blood to the baby after he emerged from the birth canal and before the cord was clamped. Johnson admitted to the baby's pediatrician that she used cocaine the night before she delivered. A basic toxicology test performed on Johnson and her son was positive for benzoylecgonine, a metabolite or "breakdown" product of cocaine.
In December 1988, Johnson, while pregnant with a daughter, suffered a crack overdose. Johnson told paramedics that she had taken $200 of crack cocaine earlier that evening and that she was concerned about the effects of the drug on her unborn child. Johnson was then taken to the hospital for observation.
Johnson was hospitalized again on January 23, 1989, when she was in labor. Johnson told Dr. Tompkins, an obstetrician, that she had used rock cocaine that morning while she was in labor. With the exception of finding meconium stain fluid in the amniotic sack,[2] there were no other complications with the birth of Johnson's baby daughter. Approximately sixty-to-ninety seconds elapsed from the time the child's head emerged from her mother's birth canal until her umbilical cord was clamped.
The following day, the Department of Health and Rehabilitative Services investigated an abuse report of a cocaine baby concerning Johnson's daughter. Johnson told the investigator that she had smoked pot and crack cocaine three to four times every-other-day throughout the duration of her pregnancy with her daughter. Johnson's mother acknowledged that Johnson had been using cocaine for at least three years during the time her daughter and son were born.
At Johnson's trial, Dr. Tompkins testified that a mother's blood passes nutrients, oxygen and chemicals to an unborn child by a diffusion exchange at the capillary level from the womb to the placenta. The umbilical cord then circulates the baby's blood (including the exchange from its mother) between the placenta and the child. Metabolized cocaine derivatives in the mother's blood thus diffuse from the womb to the placenta, and then reach the baby through its umbilical cord. Although the blood flow is somewhat restricted during the birthing process, a measurable amount of blood is transferred from the placenta to the baby through the umbilical cord during delivery and after birth.
Dr. Shashi Gore, a pathologist and toxicologist, testified that cocaine has a half life of about one hour. This means that half of the amount of the drug remains in a person's blood stream for about one hour. The remainder gradually decreases over a period of forty-eight to seventy-two hours. The liver metabolizes the cocaine into benzoylecgonine which travels through the kidneys and into the urine until it is voided.
*1292 When Dr. Gore was asked whether a woman who had smoked cocaine at 10:00 p.m. and again between 6:00 and 7:00 a.m. the following morning and delivered a child at 1:00 p.m. that afternoon would still have cocaine or benzoylecgonine present in her blood stream at the time of delivery, the response was yes. When asked whether a woman who had smoked cocaine sometime the night before delivering a child at 8:00 in the morning would still have cocaine or benzoylecgonine in her system at the time of the child's birth, the response again was yes.
Dr. Stephen Kandall, a neonatologist, testified for the defense that it was impossible to tell whether the cocaine derivatives which appeared in these children's urine shortly after birth were the result of the exchange from the mother to her children before or after they were born because most of it took place from womb to the placenta before the birth process was complete.
He also testified that blood flow to the infant from the placenta through the umbilical cord to the child is restricted during contractions. Cocaine also constricts the passage of blood dramatically but benzoylecgonine does not. Dr. Kandall admitted that it is theoretically possible that cocaine or other substances can pass between a mother and her baby during the thirty-to-sixty-second period after the child is born and before the umbilical cord is cut, but that the amount would be tiny.
I submit there was no medical testimony adequate to support the trial court's finding that a "delivery" occurred here during the birthing process, even if the criminal statute is applicable. The expert witnesses all testified about blood flow from the umbilical cord to child. But that blood flow is the child's and the placenta through which it flows, is not part of the mother's body. No witness testified in this case that any cocaine derivatives passed from the mother's womb to the placenta during the sixty-to-ninety seconds after the child was expelled from the birth canal. That is when any "delivery" would have to have taken place under this statute, from one "person" to another "person."
Further, there was no evidence that Johnson timed her dosage of cocaine so as to be able to transmit some small amount after her child's birth. Predicting the day or hour of a child's birth is difficult to impossible even for experts. Had Johnson given birth one or two days later, the cocaine would have been completely eliminated, and no "crime" would have occurred. But since she went into labor which progressed to birth after taking cocaine when she did, the only way Johnson could have prevented the "delivery" would have been to have severed the cord before the child was born which, of course, would probably have killed both herself and her child. This illustrates the absurdity of applying the delivery-of-a-drug statute to this scenario.
However, in my view, the primary question in this case is whether section 893.13(1)(c)1. was intended by the Legislature to apply to the birthing process. Before Johnson can be prosecuted under this statute, it must be clear that the Legislature intended for it to apply to the delivery of cocaine derivatives to a newborn during a sixty-to-ninety second interval, before severance of the umbilical cord. I can find no case where "delivery" of a drug was based on an involuntary act such as diffusion and blood flow.[3] Criminal statutes must be *1293 strictly  not loosely  construed. § 775.021(1), Fla. Stat. (1989); Perkins v. State, 576 So.2d 1310 (Fla. 1991); State v. Jackson, 526 So.2d 58 (Fla. 1988); Ferguson v. State, 377 So.2d 709 (Fla. 1979).
Further, in construing a statute, we must consider its history, the evil to be corrected, the intention of the Legislature, the subject to be regulated and the objects to be attained. Singleton v. Larson, 46 So.2d 186 (Fla. 1950). Legislative intent is the polestar by which the courts must be guided. State v. Webb, 398 So.2d 820 (Fla. 1981); Singleton 46 So.2d at 189; Philip Crosby Associates, Inc. v. State Board of Independent Colleges, 506 So.2d 490 (Fla. 5th DCA 1987); Osteen v. Morris, 481 So.2d 1287 (Fla. 5th DCA 1986). Legislative intent may be express or it may be gathered from the purpose of the act, the administrative construction of it, other legislative acts bearing upon the subject, and all the circumstances surrounding and attendant upon it. City of St. Petersburg v. Carter, 39 So.2d 804 (Fla. 1949)... . . My review of other pertinent legislative enactments, specifically chapter 415, leads me to conclude in this case that the Legislature expressly chose to treat the problem of drug dependent mothers and newborns as a public health problem and that it considered but rejected imposing criminal sanctions, via section 893.13(1)(c)1.
In 1982, sections 415.501-514 were enacted to deal with the problem of child abuse and neglect. The Legislature determined that because of the impact that abuse or neglect has on a victimized child, siblings, family structure, and inevitably on all citizens of the state, the prevention of child abuse and neglect is a priority of this state. § 415.501, Fla. Stat. (1989). To further this end, the Legislature required that a comprehensive approach for the prevention of abuse and neglect of children be developed for the state. Id. The statute defined an "abused or neglected child" as a child whose physical or mental health or welfare was harmed, or threatened with harm, by the acts of omissions of the parent or other person responsible for the child's welfare. As originally defined, "harm" included physical or mental injury, sexual abuse, exploitation, abandonment, and neglect. § 415.503(7), Fla. Stat. (1983)
In 1987, a bill was proposed to broaden the definition of "harm" to include physical dependency of a newborn infant upon certain controlled drugs. However, there was a concern among legislators that this language might authorize criminal prosecutions of mothers who give birth to drug-dependent children. Comment, A Response to "Cocaine Babies"  Amendment of Florida's Child Abuse and Neglect Laws to Encompass Infants Born Drug Dependent, 15 Fla.S.U.L.Rev. 865, 877 (1987).[4] The bill was then amended to provide that no parent of a drug-dependent newborn shall be subject to criminal investigation solely on the basis of the infant's drug dependency. In the words of the sponsor of the House bill:
This clearly states that the individual would not be subject to any investigation solely upon the basis of the infant's drug dependency.
The prime purpose of this bill is to keep the families intact. It's not for the purpose of investigation.
* * * * * *
Again, there is a well-founded anxiety that we are looking to arrest Moms. We're not looking to do that. What we are looking to do is we're looking to intervene on behalf of many different state policies....
*1294 The bill was passed by the Legislature and the changes were codified in section 415.503(9)(a)2. Ch. 87-90 § 1, Laws of Fla.
From this legislative history, it is clear that the Legislature considered and rejected a specific statutory provision authorizing criminal penalties against mothers for delivering drug-affected children who received transfer of an illegal drug derivative metabolized by the mother's body, in utero. In light of this express legislative statement, I conclude that the Legislature never intended for the general drug delivery statute to authorize prosecutions of those mothers who take illegal drugs close enough in time to childbirth that a doctor could testify that a tiny amount passed from mother to child in the few seconds before the umbilical cord was cut. Criminal prosecution of mothers like Johnson will undermine Florida's express policy of "keeping families intact" and could destroy the family by incarcerating the child's mother when alternative measures could protect the child and stabilize the family. Comment, A Response to "Cocaine Babies", 15 Fla.S.U.L.Rev. at 881.
In similar cases in which charges have been brought against mothers after delivery of drug-affected newborns, those charges have been dismissed. See People v. Hardy, 188 Mich. App. 305, 469 N.W.2d 50 (1991); People v. Bremer, No. 90-32227-FH (Mich.Cir.Ct. January 31, 1991); State v. Gray, 1990 WL 125695, No. L-89-239 (Ohio Ct. App. August 31, 1990), jurisdictional motion allowed, 57 Ohio St.3d 711, 568 N.E.2d 695 (1991). In People v. Bremer, the defendant was charged with delivery of cocaine to her newborn daughter after urine samples from the defendant and child following birth tested positive for benzoylecgonine. The circuit court concluded that the Michigan Legislature never intended to include the action of the defendant under the delivery statute:
To interpret this section to cover ingestion of cocaine by a pregnant woman would be a radical incursion upon existing law. A person may not be punished for a crime unless her acts fall clearly within the language of the statute. The specific language of this act does not allow the strained construction advanced by the prosecution.
Neither judges nor prosecutors can make criminal laws. This is the purview of the Legislature. If the Legislature wanted to punish the uterine transfer of cocaine from a mother to her fetus, it would be up to the Legislature to consider the attending public policy and constitutional arguments and then pass its legislation. The Legislature has not done so and the court has no power to make such a law.
The Michigan court also rejected the prosecutor's argument that charging women with delivery of controlled substances to their newborns provides a strong deterrent against unlawful use of drugs by pregnant women and prompts them to drug treatment. The court noted that prosecution of these women would likely have the opposite effect. A woman may abort her child or avoid prenatal care or treatment out of fear of prosecution. Thus the court concluded that the state's interest was better served by making treatment programs available to pregnant addicts rather than driving them away from treatment by criminal sanctions.
In State v. Gray, the defendant was indicted for child endangering based on her use of cocaine during the last trimester of pregnancy. The trial court concluded that the child endangering statute did not apply to this situation and dismissed the charge against her. On appeal, the state of Ohio argued that the trial court had failed to consider the time the fetus is a child and still attached to the mother and the duty of care created at that point. The appellate court concluded that the Ohio General Assembly did not intend to criminalize the passage of harmful substances from a mother to a child in the brief moments from birth to the severance of the umbilical cord. "To construe the statute in this manner would mean that every expectant woman who ingested a substance with the potential of harm to her child, e.g., alcohol or nicotine, would be criminally liable under [the child endangering statute]. We do not *1295 believe such result was intended by the General Assembly."
There can be no doubt that drug abuse is one of the most serious problems confronting our society today. National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 1395, 103 L.Ed.2d 685 (1989). Of particular concern is the alarming rise in the number of babies born with cocaine in their systems as a result of cocaine use by pregnant women. Some experts estimate that as many as eleven percent of pregnant women have used an illegal drug during pregnancy, and of those women, seventy-five percent have used cocaine. Report of the American Medical Association Board of Trustees, Legal Interventions During Pregnancy, 264 JAMA 2663 (Nov. 28, 1990). Others estimate that 375,000 newborns per year are born to women who are users of illicit drugs. American Public Health Association 1990 Policy Statement.
It is well-established that the effects of cocaine use by a pregnant woman on her fetus and later on her newborn can be severe. On average, cocaine-exposed babies have lower birth weights, shorter body lengths at birth, and smaller head circumferences than normal infants. 264 JAMA at 2666. Cocaine use may also result in sudden infant death syndrome, neural-behavioral deficiencies as well as other medical problems and long-term developmental abnormalities. American Public Health Association 1990 Policy Statement. The basic problem of damaging the fetus by drug use during pregnancy should not be addressed piecemeal, however, by prosecuting users who deliver their babies close in time to use of drugs and ignoring those who simply use drugs during their pregnancy.
Florida could possibly have elected to make in utero transfers criminal. But it chose to deal with this problem in other ways. One way is to allow evidence of drug use by women as a ground for removal of the child to the custody of protective services, as was done in this case. Some states have responded to this crisis by charging women with child abuse and neglect. See In re Baby X, 97 Mich. App. 111, 293 N.W.2d 736 (1980) (newborn suffering from narcotics withdrawal symptoms due to prenatal maternal drug addiction is neglected and within jurisdiction of the probate court); In re Smith, 128 Misc.2d 976, 492 N.Y.S.2d 331 (N.Y. Fam. Ct. 1985) (person under Family Court Act includes unborn child who is neglected as the result of mother's conduct); In re Ruiz, 27 Ohio Misc.2d 31, 27 O.B.R. 350, 500 N.E.2d 935 (Com.Pl. 1986) (mother's use of heroin close to baby's birth created substantial risk to the health of the child and constituted child abuse).
However, prosecuting women for using drugs and "delivering" them to their newborns appears to be the least effective response to this crisis.[5] Rather than face the *1296 possibility of prosecution, pregnant women who are substance abusers may simply avoid prenatal or medical care for fear of being detected. Yet the newborns of these women are, as a group, the most fragile and sick, and most in need of hospital neonatal care. A decision to deliver these babies "at home" will have tragic and serious consequences. As the Board of Trustees Reports notes:
[C]riminal penalties may exacerbate the harm done to fetal health by deterring pregnant substance abusers from obtaining help or care from either the health or public welfare professions, the very people who are best able to prevent future abuse. The California Medical Association has noted:
While unhealthy behavior cannot be condoned, to bring criminal charges against a pregnant woman for activities which may be harmful to her fetus is inappropriate. Such prosecution is counterproductive to the public interest as it may discourage a woman from seeking prenatal care or dissuade her from providing accurate information to health care providers out of fear of self-incrimination. This failure to seek proper care or to withhold vital information concerning her health could increase the risks to herself and her baby.
Florida's Secretary of Health and Rehabilitative Services has also observed that potential prosecution under existing child abuse or drug use statutes already `makes many potential reporters reluctant to identify women as substance abusers.' (footnotes omitted)
264 JAMA at 2669. See also Commonwealth v. Pellegrini, No. 87970 (Mass. Superior Court Oct. 15, 1990) (by imposing criminal sanctions, women may turn away from seeking prenatal care for fear of being discovered, undermining the interests of the state in protecting potential human life). Prosecution of pregnant women for engaging in activities harmful to their fetuses or newborns may also unwittingly increase the incidence of abortion.[6]
Such considerations have led the American Medical Association Board of Trustees to oppose criminal sanctions for harmful behavior by a pregnant woman toward her fetus and to advocate that pregnant substance abusers be provided with rehabilitative treatment appropriate to their specific psychological and physiological needs. 264 JAMA at 2670. Likewise, the American Public Health Association has adopted the view that the use of illegal drugs by pregnant women is a public health problem. It also recommends that no punitive measures be taken against pregnant women who are users of illicit drugs when no other illegal acts, including drug-related offenses, have been committed. See 1990 Policy Statement.
In summary, I would hold that section 893.13(1)(c)1. does not encompass "delivery" of an illegal drug derivative from womb to placenta to umbilical cord to newborn after a child's birth. If that is the intent of the Legislature, then this statute should be redrafted to clearly address the basic problem of passing illegal substances from mother to child in utero, not just in the birthing process.
[6] See 264 JAMA at 2667; Rush, Prenatal Care Taking: Limits of State Intervention With and Without Roe, 39 Univ.Fla.L.Rev. 55, 68 n. 38 (1986). A woman could simply "opt out" of the scope of any criminal regulations by terminating the pregnancy through abortion. 39 Univ. Fla.L.Rev. at 68 n. 38.
Johnson, 578 So.2d at 421-427 (Sharp, J., dissenting) (alteration in original).
Since the Fifth District Court of Appeal's decision, several other courts have ruled on issues similar to ones presented in this case. See State v. Gethers, 585 So.2d 1140 (Fla. 4th DCA 1991) (child abuse statute did not reach unborn fetus and therefore defendant could not be prosecuted for child abuse based on introduction of cocaine into her own body during the gestation period of her unborn child); see also State v. Gray, 62 Ohio St.3d 514, 584 N.E.2d 710 (1992) (parent may not be prosecuted for child endangerment for substance abuse occurring before birth of the child); People v. Morabito, 151 Misc.2d 259, 580 N.Y.S.2d 843 (N.Y. City Ct. 1992) (mother could not be charged with endangering welfare of child based upon acts endangering unborn child); and Welch v. Commonwealth, No. 90-CA-1189-MR, (Ky. Ct. App. Feb. 7, 1992) (mother could not be charged with criminal abuse of an unborn child for her drug use *1297 during pregnancy). At oral argument the State acknowledged that no other jurisdiction has upheld a conviction of a mother for delivery of a controlled substance to an infant through either the umbilical cord or an in utero transmission; nor has the State submitted any subsequent authority to reflect that this fact has changed. The Court declines the State's invitation to walk down a path that the law, public policy, reason and common sense forbid it to tread. Therefore, we quash the decision below, answer the certified question in the negative, and remand with directions that Johnson's two convictions be reversed.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
NOTES
[1] Section 893.13(1)(c)1., Florida Statutes (1989) provides as follows:

893.13 Prohibited acts; penalties 
* * * * * *
(c) Except as authorized by this chapter, it is unlawful for any person 18 years of age or older to deliver any controlled substance to a person under the age of 18 years, or to use or hire a person under the age of 18 years as an agent or employee in the sale or delivery of such a substance, or to use such person to assist in avoiding detection or apprehension for a violation of this chapter. Any person who violates this provision with respect to:
1. A controlled substance ... is guilty of a felony of the first degree... .
[2] This condition may indicate that the baby is normal or that its neurological function has been compromised.
[3] As examples of delivery of a controlled substance, see State v. Medlin, 273 So.2d 394 (Fla. 1973) (defendant's conviction for delivering a barbiturate affirmed where a defendant gave sixteen-year-old girl a capsule, advising her that it would make her go up and gave her another pill to be taken when she came down); Gelsey v. State, 565 So.2d 876 (Fla. 5th DCA 1990) (defendant's conviction for delivery of a controlled substance affirmed where he met with officers and exchanged crack and cash for powdered cocaine); Roberts v. State, 557 So.2d 685 (Fla. 5th DCA 1990) (defendant's conviction for delivery of cocaine affirmed where he sold one rock of cocaine to undercover officer); Willingham v. State, 541 So.2d 1240 (Fla. 2d DCA), rev. denied, 548 So.2d 663 (Fla. 1989) (delivery of cocaine convictions affirmed where defendant offered two pieces of rock cocaine to officer, officer bought one and defendant retained the other); Newman v. State, 522 So.2d 71 (Fla. 4th DCA 1988) (defendant's conviction for trafficking in cocaine by constructive delivery affirmed where cocaine was sampled and cocaine and money not yet exchanged); King v. State, 336 So.2d 1200 (Fla. 2d DCA 1976), cert. denied, 345 So.2d 424 (Fla.), cert. dismissed, King v. Florida, 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977) (defendant guilty of delivery of narcotics by writing prescriptions in bad faith); State v. Vinson, 298 So.2d 505 (Fla. 2d DCA 1974) (physician who issued prescription for drug in bad faith guilty of delivery).
[4] The staff analysis of this bill noted that the legislation, as written, provided a likelihood that a parent could be criminally prosecuted under chapter 893 for delivering a drug dependent child.
[5] As the AMA Board of Trustees Report notes, possession of illicit drugs already results in criminal penalties and pregnant women who use illegal substances obviously are not deterred by existing sanctions. Thus the goal of deterrence is not served. To punish a person for substance abuse ignores the impaired capacity of these individuals to make rational decisions concerning their drug use. "In all but a few cases, taking a harmful substance such as cocaine is not meant to harm the fetus but to satisfy an acute psychological and physical need for that particular substance. If a pregnant woman suffers from a substance dependency, it is the physical impossibility of avoiding an impact on fetal health that causes severe damage to the fetus, not an intentional or malicious wish to cause harm." 264 JAMA at 2667-2668. Punishment is simply not an effective way of curing a dependency or preventing future substance abuse. Id. at 2667. See also National Treasury Employees Union, 109 S.Ct. at 1396 ("Addicts may be unable to abstain even for a limited period of time, or may be unaware of the `fade-away affect' of certain drugs."). Stated another way:

However the initial use of a drug might be characterized, its continued use by addicts is rarely, if any, truly voluntarily. Drug addiction tends to obliterate rational, autonomous decision making about drug use. Drugs become a necessity for dependent users, even when they would much prefer to escape their addiction. In virtually all instances, a user specifically does not want to harm her fetus, yet she cannot resist the drive to use the drug. Thus it is not plausible to attribute to drug-using women a motive of causing harm to the fetus.
Mariner, Glantz and Annas, Pregnancy, Drugs and the Perils of Prosecution, 9 Criminal Justice Ethics 30, 36 (Winter/Spring 1990).