ANNIE CORDES v. THE STATE.

No. 3894. Decided June 17, 1908.

1.—Murder—Infanticide—Charge of Court—Requested Charge.

Where upon trial for murder the court in his general charge had given the first clause of the requested charge, and the second clause of the requested charge was on the weight of the evidence, there was no error in refusing to give the entire requested charge.

2.—Same—Singling Out Testimony—Requested Charge.

Upon trial for murder there was no error in refusing defendant's special charge which singled out certain testimony for the jury to pass upon.

3.—Same—Evidence—Short Hand Rendering of Fact—Physical Appearance of Defendant.

Upon trial for murder there was no error to permit a State's witness to testify that a short time before the infanticide, witness saw defendant and that she looked as if she were in a family way.

4.—Same—Clothes of Deceased—Evidence.

Upon trial for murder there was no error to permit the State's witness to identify and exhibit to the jury in evidence a portion of a blanket purporting to have been found wrapped around the deceased infant, similar to another portion of blanket found at the home of defendant.

5.—Same—Evidence—Defendant's Acts and Declarations—Arrest.

Upon trial for murder there was no error in permitting the sheriff to testify that before arresting defendant he informed her that if she would allow herself to be examined by a physician then present for the purpose of seeing whether or not she had recently borne a child that he would not arrest her if this was not shown; that the defendant refused, and stated that she had not borne a child recently; as defendant was not then under arrest.

**6.—Same—Evidence—Physical Examination.**

Upon trial for murder there was no error in permitting the county physician to testify that at the request of State's counsel he went to the jail and made a physical examination of defendant with her consent, and that it was his opinion that she had borne a child within a period of three weeks prior to such examination.

**7.—Same—Evidence—Tracks—Loss of Measure.**

On trial for murder there was no error in permitting the State's witness to testify that he found tracks from the house of defendant to the place where the dead body of the infant was found; that he measured these tracks with a stick and that the tracks corresponded in measurement, with the exception of being a little shorter, with a pair of men's shoes found at defendant's residence, and that the stick with which he measured the tracks had been lost.

**8.—Same—Evidence—Expert Testimony—Hypothetical Question.**

Where upon trial for murder the hypothetical question propounded to an expert witness embraced practically, if not literally, all the testimony which had been given by another witness upon the question propounded to the expert witness, there was no error in propounding the question and admitting the answer thereto to the jury. Following Burt v. State, 38 Texas Crim. Rep., 397.

**9.—Same—Argument of Counsel.**

Upon trial for murder where the evidence raised the issue of infanticide, the argument of State's counsel that the defendant had a motive in killing the child in order to conceal her shame, etc., which remark the court withdrew from the consideration of the jury there was no reversible error.

**10.—Same—Reading Law to Jury.**

Upon trial for murder, there was no error in the court's refusal to permit defendant's counsel to read a decision of the Court of Criminal Appeals to the jury. Questions of law must be addressed to the court.

**11.—Same—Charge of Court—Infanticide.**

Where upon trial for murder the evidence raised the issue of infanticide, there was no error in the court's definition of this offense, according to the rules laid down in a former precedent of this court.

**12.—Same—Charge of Court—Principals—Express Malice.**

Where upon trial for murder the evidence raised the issue that defendant and another committed the crime, there was no error in the court's charge in failing to charge express malice of defendant at the time defendant agreed with her codefendant to kill the deceased, in the court's charge on principals; when considering the court's charge as an entirety.

**13.—Same—Sufficiency of Evidence.**

Where upon trial for murder the State's testimony supported a verdict for murder in the first degree, the same will not be disturbed although one of the State's witnesses was impeached by other witnesses.

Appeal from the District Court of Gonzales. Tried below before the Honorable M. Kennon.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*Rainbolt & Blanton,* for appellant.—On question of admitting evidence and arrest of defendant: Craig v. State, 30 Texas Crim. App., 619; 18 S. W. Rep., 297; Nolen v. State, 9 Texas Crim.

App., 426; Wood v. State, 22 Texas Crim. App., 431; 3 S. W. Rep., 338; Hart v. State, 15 Texas Crim. App., 230; Rix v. State, 33 Texas Crim. Rep., 358. On question of charge on principals: Red v. State, 53 S. W. Rep., 618; Leslie v. State, 57 S. W. Rep., 661. On question of reading law to jury: Lott v. State, 18 Texas Crim. App., 627. On question of sufficiency of evidence: Walker v. State, 14 Texas Crim. App., 629; Owens v. State, 35 Texas Crim. Rep., 345.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was indicted for the murder of her child, and upon conviction her punishment was assessed at imprisonment for life.

The facts, in substance, show that appellant and her brother, Eilert Cordes, lived upon a farm in Gonzales County, occupying alone their home. In August, 1906, Eilert secured the services of several negroes to assist in picking cotton. These negroes lived in a house twenty or thirty yards from the home while engaged in picking cotton. One negro, Johnnie Hamilton, testified that he slept in the kitchen by the cooking stove in the same house and in an adjoining room to appellant. "That night I heard a baby cry in the night and heard them walking around in the house. I don't think I heard it cry but once that night before I went to sleep. I got up the next morning before sun up and heard it crying in the house next morning. It sounded like it was in the room from me adjoining the kitchen. I don't know who lived in there. I couldn't say what room they stayed in. Nobody else lived in that house but these people. It was about between six and seven o'clock in the morning when I heard the baby cry. I saw Mr. Cordes around the house that morning and I saw him afterwards during the day when he passed me going down towards the creek. He had a bundle under his arm that looked like a croker sack or saddle blanket balled up under his arm, but I couldn't say what it was. When he came back from the creek he had nothing with him. I never heard the baby cry after he carried the bundle off. I stayed there Tuesday, Wednesday, and Thursday, and went to town Friday evening and heard that the baby had been found Saturday night of the same week." A baby was found in the creek, which was some three or four hundred yards from appellant's home.

Dr. Finny Blackwell, in reference to finding the child, testified as follows: "I visited the water hole about two or three hundred yards away from the house of the defendant about the 10th or 11th of August of last year, and then went with Mr. Johnson, the sheriff, on that night to Cordes' house. At the water hole I found something covered up in a gunny sack and blanket very badly decom-

posed. I came to the place and found Mr. Pittman and another gentleman there and stayed on the bank and waited for the justice of the peace and Mr. Johnson. And they didn't come and I picked the gunny sack up and unwrapped the blanket and found a little girl baby and I examined it and went over it very thoroughly. The body was very much decomposed. The head had been fractured and the ribs had been broken or fractured. The brains were gone, and the membranes were intact. It was either the third and fourth or the fourth and fifth rib that was fractured. In addition the child had a string tied around its neck three times and tight as tight could be, and the back and shoulders of the child were badly decomposed. I pried the ribs open and got hold of the lung and opened it and extracted the lung and introduced two fingers and pulled out a part of the lung tissue, and when I pushed around in it air and water escaped. That air might have come from two or three places. It might have been caused from putrefaction and it might have been caused from natural prevailing conditions. The color of the lung tissue differed; it was light in places, but where it was badly decomposed it was of a brown hue, but I could not say positively just what the color was, looking at it with my naked eye, and from a scientific standpoint. I could not say whether the air had been breathed in there or whether it was the result of putrefaction. The child was well developed and would have weighed about eight or nine pounds. For a living child to have its brains knocked out would kill it sure; the wounds in the side untreated I think would have killed it. I don't think it would have produced immediate death. The string tied three times around its neck would have killed it. A living child would live a very few minutes with that string around its neck. A still born child would have a flat chest and the diaphragm would be way up. In a child that had lived you would find air in its lungs that could not be expelled. If it had been completely submerged for four or five days it would not have decomposed that fast. From my examination of the body and the appearance of the lung tissue I could not state whether that child had ever lived or not. I can state that you would have found those conditions in a child that had breathed, but I must state that results of putrefaction would produce the same results. A child by the act of breathing produces a rounded condition of the chest, and this child's chest was rounded. The lungs were extended; its abdomen was swollen and the skin around its neck had broken where the string was tied and it was decomposed all over. Any part of that child would float. As a medical expert I can not say whether or not that child lived. I can state that the air and extension of that lung would indicate that the child had breathed, but at the same time I believe the results of decomposition in that side would produce the distension just the same. The

child's breast was round and distended and the diaphragm was down." The child had been taken out of the water upon which it was floating a short while before the doctor reached the scene. Johnnie Hamilton swore it was two or three o'clock in the evening on Monday that he saw Cordes go down to the creek with a bundle under his arm. The negroes who lived in the house on the farm testified that appellant was sick at the time that Johnnie Hamilton says he heard the baby cry, and was sick for several days. Various witnesses testify that appellant appeared to be pregnant a short while before the child was found, and at that time did not show any signs of pregnancy. The doctor who examined appellant after she was placed in jail testified · that everything indicated that she had given birth to a child a short while before the examination, some seven or eight days. The testimony shows that this will correspond with the date that Hamilton says he heard the baby cry. The sheriff testifies to taking a sack and blanket and a string that were found around the baby's neck and comparing them with blankets and cloth found in the home of · appellant, and they correspond in texture and color with said blanket and cloth so found. He says the blanket he took from around the child was dirty and bloody and after washing it, it was of a lighter color than · the blanket found in the house, but in texture and other respects corresponded. The figures on the cloth string around the baby's neck corresponded with the figures on the cloth in the home. The sheriff through an interpreter asked appellant if she had given birth to a child prior to her arrest. She denied it. Several bloody clothes and garments were found in the house indicative of child birth. This, in substance, as we glean from the statement of facts is the testimony.

Appellant complains the court erred in refusing to give the following charge: "In this case you are instructed that unless you find from a preponderance of the evidence, that the child with whose murder the defendant is charged had a complete and independent existence from its mother and was wholly born alive then you must acquit the defendant. In this connection you are further charged that the testimony of the physicians in this case is not sufficient to show that said child was wholly born alive and had a complete and independent existence from its mother, and unless you further believe that the testimony of the witness Johnny Hamilton is true you will acquit the defendant." The first clause of the charge was given by the court in his main charge. The second clause is a charge upon the weight of evidence and should not have been given.

Appellant further complains of the refusal of the court to give the following charge: "In this case you are charged that there is not sufficient testimony in this case to convict the defendant unless you believe in connection with the other testimony in the case, that the testimony of the witness Johnnie Hamilton, to the effect

that he heard the child cry, is true; and unless you so believe this portion of the testimony of the witness Johnnie Hamilton to be true, you will acquit the defendant." It is never required or proper for a court to single out testimony and charge upon same as suggested in appellant's special charge.

Bill of exceptions No. 1 complains of the following: The State proved, by the witness Neighbors, over objection of appellant, that a short time previous to the finding of the body of the dead child in the water hole that he passed along by the road a distance of about fifty yards from the home of the defendant and that he saw her and that she looked as if she was in a family way; and the defendant at the time said testimony was offered objected to same on the ground that the proper method was for the witness to describe her appearance, that he had not qualified as a medical expert, and that his testimony that "she looked as if she was in a family way" was but a conclusion of the witness and, therefore, inadmissible. This testimony was legitimate. It is but shorthand rendering of the facts, and it was proper for the witness to state what was the appearance of appellant at that time.

Bill of exceptions No. 2 shows that the State proved by the witness Jim Pittman, over objection of appellant, that he lived on the adjoining tract of land from defendant, was a married man and had children, and saw her on several occasions just prior to the time the child was found in the hole; that his house was about 400 yards from that of defendant, and that he had also seen her from the road which was about fifty yards from the house of defendant and that just before this occurrence (finding of the baby) she looked to him like she was going to have a baby. Appellant objected to this testimony for the same reasons above stated. This testimony was also admissible.

Bill of exceptions No. 3 complains that W. W. Johnson, sheriff, was permitted to identify and exhibit to the jury in evidence a portion of a blanket purporting to have been found wrapped around the deceased infant, and which the witness testified was similar to another portion of blanket found at the home of defendant; that the portion shown to the jury and purporting to have been found around the body of the deceased infant, has been washed and was now white in color, while originally when found it was very dirty and bloody and of a dark color, practically the same color of the other portion found at the home of defendant. Appellant objected to the same for the reason it did not show the exact condition of the blanket when found, nor the same color. This objection would only go to the weight of the testimony, and not to its admissibility.

Bill of exceptions No. 4 shows the sheriff testified as follows: While he was at defendant's home, whither he had gone for the

purpose of investigating the murder of the child, defendant made the following statement to him: That he saw her at her home and told her if she would allow herself to be examined by a physician then present for the purpose of seeing whether or not she had recently borne a child that he would not arrest her if her condition showed that she had not recently borne a child, and that defendant refused to allow an examination made of her person at that time, but stated that she had not borne a child recently, to which testimony that she stated to the sheriff at that time that she had not borne a child but would not allow an examination of her person to be made, the defendant objected on the ground that said statement was shown to have been made while the defendant was virtually under arrest; that she had not been warned, and that the statement was not in writing. Witness further testified that he had not arrested the defendant at the time this statement was made. Under the facts of this bill we believe defendant was not under arrest. See Hart v. State, 15 Texas Crim. App., 202.

Bill of exceptions No. 5 complain of the same testimony discussed in the last bill. Bill of exceptions No. 6 shows that Dr. McCaleb, county physician, at the request of the district attorney, went over to the jail and made an examination of the womb and private parts of the defendant, and that it was his opinion from that examination that she had borne a child within a period of three weeks prior to such examination; that he told her he was the county physician and present for the purpose of examining her if she would permit it, but that he would not examine her without her consent and she consented. Defendant at the time said testimony was offered objected to same for the reason that such examination was made while she was under arrest, and that it was in effect forcing her to furnish testimony against herself. Appellant consenting, any physical condition upon her person could be made manifest by an examination.

Bill of exceptions No. 7 complains that Tom Holly was permitted to testify that he found tracks leading from the house where defendant resided to the hole of water where the dead body was found and back again; that he measured these tracks with a stick and that they corresponded in measurement, with the exception of being a little shorter, with a pair of men's shoes found at the residence of the defendant; that he did not know what become of the measure and did not know where it was, and the defendant at the time said testimony was offered objected to same for the reason that the stick was the best evidence of the size of the tracks found by the witness and that it had not been identified as belonging to any particular person, and did not connect defendant with the crime. It did not devolve upon the State to produce the stick before the witness could testify. If the stick was not produced and the shoes

were measured by said stick, this fact would merely go to the accuracy and credibility of the witness's testimony rather than to its admissibility.

Bill of exceptions No. 8 complains of the introduction of testimony of the sheriff as to what appellant stated, and has been reviewed above.

Bill of exceptions No. 9 complains of the following: Dr. McCaleb, medical expert, was asked the following hypothetical question: "If you were called upon to examine a dead infant found under the following condition: The body badly decomposed and freshly taken from a hole of water, and you were to unwrap a gunny sack with rocks in it and a blanket wrapped around the body of the child and find that child's head broken, the brains all gone, two of its ribs broken and the membranes of the brain intact, with a string tied three times tightly around the child's neck and you were to prize its ribs open and pull out a portion of the child's lung and you were to press on the lung and air and water came out of it, and the appearance of that lung was light in color in places, and where it was decomposed it was of a brown hue and you were to find the naval string of that child tied with a string, and the appearance of the child showed it to be a fully developed female child weighing about nine pounds and upon pressing on it, when the lung was pulled out of the pleural cavity there were gasses in the lung, and it would spue and bubble, what would be your opinion as to whether that infant lived or not independent of its mother were that child's breast rounded out and its diaphragm dropped down?" To which question the defendant then and there in open court objected on the ground that same was illegal and inadmissible for the reason that said question did not contain all the material facts as to the condition of the child when found; that the doctor was not present and did not hear the witness testify to the condition of the child, and that the question does not give an accurate description of the condition of the child when found, all of which objections were overruled, and the doctor answered, "I think it lived," and said answer of said witness was permitted to go to the jury. In the trial of cases of this character it is permissible to put hypothetical questions to medical experts. In the first place, we wish to say, in substance, the above is practically all, if not literally, of the testimony as to the condition of the child when found. These facts were testified to by Dr. Blackwell, and the State in asking Dr. McCaleb the question practically reproduced the testimony of said Dr. Blackwell. See Burt v. State, 38 Texas Crim. Rep., 397.

Bill of exceptions No. 10 shows defendant complained of the argument of the district attorney, to wit: "The defendant did have a motive in killing this child and that motive was to conceal her shame of having a child begotten by her brother." Appellant objected

to this on the ground that there was no evidence introduced showing said statement to be true, and was prejudicial, therefore, to the defendant. The court stopped the district attorney and admonished the jury not to consider such argument, and appellant requested the court to give the following charge: "You are hereby instructed to disregard the argument of the district attorney in his opening address in which he stated that the defendant had a motive in killing this child and that motive was to conceal her shame of having a child begotten by her brother, for the reason that there is no testimony in this case to authorize such remarks." In the light of the admonition of the court to the jury to disregard this statement and special charge to the same effect, we do not believe there is any error in the statement of the district attorney authorizing a reversal of this case.

Bill of exceptions No. 11 complains that the court refused to permit appellant to read to the jury the case of Wallace v. State, 10 Texas Crim. App., 255. The court refused to do this on the ground that it was his rule not to permit decisions read to the jury. We do not believe there was any error in the ruling of the court. Questions of law must be addressed to the court and not to the jury.

The first ground of appellant's motion for a new trial complains of the following: "Homicide is the destruction of the life of one human being by the act, agency, procurement, or culpable omission of another. The person upon whom homicide is alleged to have been committed must be in existence by actual birth. That is to say the child must have been completely expelled from the body of the mother, and must thereafter have been alive, before the infliction of the injury alleged to have caused its death."

"As a preliminary inquiry in a case of this class, the jury must find (1) That the child in question was totally expelled alive from its mother's body. (2) That it lived in an independent existence after such expulsion; and, (3) That its death was caused by violence inflicted upon its person by some other person after the commencement of such independent existence. If all these propositions are not found to be true beyond a reasonable doubt, then no further inquiry need be made." This charge is practically a reproduction of the charge in the case of Wallace v. State, above cited, which this court held was a proper presentation of the law.

On the doctrine of principals the court charged as follows: "Or that by such means and at such time and place Eilert Cordes did unlawfully and with express malice kill said infant, and that when the said Eilert Cordes so killed said infant, the defendant was present and had agreed with the said Eilert Cordes to so kill said infant; or that she was present when the said Eilert Cordes so killed said infant (if he did so), and knowing his unlawful intent, did aid him by acts or encourage him by words or gestures in so killing

said infant, you will find defendant guilty of murder in the first degree, and assess her punishment at death or confinement in the penitentiary for life in your discretion." Appellant insists said charge is erroneous in that it did not require her to have express malice at the time she agreed with the said Eilert Cordes to kill said infant nor did it require her to have express malice at the time she aided him by acts or encouraged him by words or gestures in so killing said infant. The charge, we hold, shows clearly a proper presentation of this question. Furthermore, we can not isolate this clause from the balance of the charge, but the court properly charged all the law applicable to the facts of this case, telling the jury that appellant must aid by words, acts or gestures and be present at the time of the commission of the offense, knowing the unlawful intent of the said Eilert Cordes.

Various other errors are alleged in the motion for a new trial of omission and commission in the charge. We have reviewed each and all of same, and must say that the charge, as stated above, is a clear, succinct and proper presentation of all the law applicable to the facts of this case. The evidence in the case, as shown above, shows clearly by circumstantial evidence that the deceased infant came to its death by the direct co-operation, participancy and consent of its mother, appellant, while assisting her brother. That it had an independent existence at the time of its death separate and independent of its mother is manifest from the cries both on the night of its birth and the morning thereafter as testified by the witness Hamilton. It is true the witness Hamilton is thoroughly impeached by divers and sundry witnesses, but this is a matter we can not pass upon. The jury have seen fit to believe him and we are not authorized to disturb the finding of the jury on a question of fact.

Finding no error in the record, the judgment is in all things affirmed.

*Affirmed.*

[Motion for rehearing overruled without written opinion, October 21, 1908.—Reporter.]