894 P.2d 733

**Teresa Lopez REINESTO, Petitioner,**

**v.**

**SUPERIOR COURT OF the STATE of Arizona, IN AND FOR the COUNTY OF NAVAJO, the Honorable William J. O'Neil, a judge thereof, Respondent Judge,**

**State of Arizona, Real Party in Interest.**

**No. 1 CA–SA 94–0348.**

Court of Appeals of Arizona, Division 1, Department C.

May 2, 1995.

Myrna J. Parker, Navajo County Public Defender by Cindy L. Wagner, Deputy Public Defender, Holbrook, Center for Reproductive Law & Policy by Lynn M. Paltrow and Susan J. Weiler, New York City, for petitioner.

Grant Woods, Atty. Gen. by Linda L. Knowles, Asst. Atty. Gen., Crim. Appeals Section, Phoenix, for real party in interest.

Nat. Ass'n of Crim. Defense Lawyers and Ariz. Attorneys for Crim. Justice by Nancy Hollander, Albuquerque, Natman Schaye, Tucson, Dennis C. Jones, Phoenix, and Ariz. Civ. Liberties Union and Ariz. Right to Choose by Bendheim & Whitten, P.C., Alice L. Bendheim, Phoenix, and The Southern Ariz. Chapter of The Nat. Lawyers Guild by Gail M. Berkowitz, Tucson, for amicus curiae.

## OPINION

McGREGOR, Judge.

The issue in this special action is whether the state can prosecute for child abuse a woman who uses heroin during pregnancy and thereafter gives birth to a heroin-addicted child. We accepted jurisdiction, concluded that Arizona's child abuse statute does not apply to the charged conduct, and ordered that the superior court dismiss the indict-

ment against petitioner, with this opinion to follow.

### I.

On July 14, 1993, the Navajo County grand jury indicted petitioner on one count of child abuse. According to testimony presented to the grand jury, petitioner gave birth to "Baby Jane" on July 2, 1993.[1] Baby Jane, who tested positive for heroin and experienced heroin withdrawal symptoms, was placed in a special care facility, adopted by one of petitioner's relatives, and released from the hospital free of addictive symptoms when she was approximately one month old. The indictment alleged that, by ingesting heroin during her pregnancy, petitioner knowingly caused injury to a child under circumstances likely to produce death or serious physical injury in violation of Arizona Revised Statutes Annotated ("A.R.S.") section 13–3623.B.1, a class 2 felony.

Petitioner moved to dismiss or to remand for a redetermination of probable cause, alleging that the prosecutor did not adequately define "child" for the grand jury and that the legislature did not intend that a fetus would be regarded as a "child" under the statute. Petitioner further argued that she had not received fair warning that the statute applied to her conduct. The trial court denied both motions, concluding that whether the state could sanction petitioner for injuries allegedly caused by prenatal conduct occurring prior to the birth of her child presented a factual issue for the jury to decide. Petitioner then filed this special action. The trial court granted a stay of the proceedings pending resolution of the special action.

### II.

#### A.

Generally, a special action is not an appropriate method to obtain review of an order denying a motion to dismiss. *Vo v. Superior Court,* 172 Ariz. 195, 198, 836 P.2d 408, 411 (App.1992). "However, where an

1. Baby Jane, whose true name is not revealed in the record, is petitioner's fourth child, the eldest

of whom also tested positive for heroin at birth.

issue is one of first impression of a purely legal question, is of statewide importance, and is likely to arise again, special action jurisdiction may be warranted." *Id.* Here, petitioner asks this court to interpret the child abuse statute, and the interpretation of a statute presents purely a question of law. *Barry v. Alberty,* 173 Ariz. 387, 389, 843 P.2d 1279, 1281 (App.1992). Moreover, this case is one of first impression and of statewide importance. We therefore exercise our discretion and accept jurisdiction of this special action to decide whether section 13–3623 applies to petitioner's conduct. *See* Arizona Rules of Procedure for Special Actions 1(a).

### B.

■ The statute under which the state charged petitioner applies to "any person" who "[u]nder circumstances likely to produce death or serious physical injury ... causes a child ... to suffer physical injury...." A.R.S. § 13–3623.B. Section 13–3623.A defines a child as "an individual who is under eighteen years of age" and physical injury as "the impairment of physical condition ... or any physical condition which imperils health or welfare."

The state does not argue that the statutory reference to a "child" includes a fetus, an argument virtually foreclosed by our holding in *Vo.*[2] The state does contend, however, that it can prosecute petitioner under the statute for prenatal conduct that caused Baby Jane injury *after* her birth. We disagree for several reasons.

■ First, the plain language of the statute does not support the state's argument. As we noted in *Vo,* "Arizona is a 'code state,' and this court is legislatively precluded from creating new crimes by expanding the common law through judicial decision." *Vo,* 172 Ariz. at 204, 836 P.2d at 417; *see also State v. Womack,* 174 Ariz. 108, 112, 847 P.2d 609,

613 (App.1992) ("Defining criminal behavior and establishing penalties for violating criminal laws are functions of the legislature, not the judiciary."). Only the legislature may create crimes. Thus, the court's function is limited to interpreting statutory language to determine what conduct the legislature has proscribed in light of its intent and the wording of a statute. *See Womack,* 174 Ariz. at 112, 847 P.2d at 613. In interpreting statutes, we must give words their fair meaning "to promote justice and effect the objects of the law...." A.R.S. § 13–104. When the meaning of a statute is unclear or subject to more than one interpretation, the rule of lenity requires us to resolve any ambiguity in favor of the defendant. *Vo,* 172 Ariz. at 200, 836 P.2d at 413; *State v. Pena,* 140 Ariz. 545, 549–50, 683 P.2d 744, 748–49 (App.1983), *approved* 140 Ariz. 544, 683 P.2d 743 (1984).

■ The plain language of section 13–3623 indicates that the legislature intended to proscribe conduct by any *person* that causes physical harm to a *child.* Applying the ordinary meaning of these words leads us to conclude that the statute refers to conduct that directly endangers a child, not to activity that affects a fetus and thereby ultimately harms the resulting child. As we discussed in *Vo,* when the legislature has intended to refer to an unborn child or fetus, the legislature has done so specifically. 172 Ariz. at 201, 836 P.2d at 414. For example, the manslaughter statute expressly prohibits "[k]nowingly or recklessly causing the death of an unborn child at any stage of its development by any physical injury to the mother of such child which would be murder if the death of the mother had occurred." A.R.S. § 13–1103. The legislature also has elected to use the death of an unborn child as an aggravating factor in criminal sentencing. *See* A.R.S. § 13–702.C.10. The legislature's specific decision to include a reference to an "unborn child" in these contexts and others[3]

---

2. In *Vo,* the state charged the defendant with two counts of first degree murder for the deaths of a pregnant woman and her unborn fetus. After considering the language of the statute, public policy, legislative intent, and the holdings in other jurisdictions, this court held that the first-degree murder statute, A.R.S. section 13–1105, does not apply to the death of an unborn fetus.

3. *See, e.g.,* A.R.S. § 36–329 (certificate filing for fetal death); A.R.S. § 36–841 (separately defining "decedent" to include stillborn under Uniform Anatomical Gift Act).

and to exclude such a reference under section 13–3623 indicates that the legislature did not intend that the child abuse statute apply to situations in which harm to a fetus subsequently affects the newborn. *See Vo,* 172 Ariz. at 201, 836 P.2d at 414; *Pima County v. Heinfeld,* 134 Ariz. 133, 134, 654 P.2d 281, 282 (1982).

Second, interpreting the statute as the state urges would be contrary to the accepted principle that criminal statutes focus on the conduct of the accused, not on the status of the alleged victim. The public policy of the state and the general purpose of the criminal code, as expressed by the legislature, are "[t]o proscribe *conduct* that unjustifiably and inexcusably causes or threatens substantial harm to individual or public interests," "[t]o give fair warning of the nature of the *conduct* proscribed and of the sentences authorized upon conviction," and "[t]o impose just and deserved punishment on those whose *conduct* threatens the public peace." A.R.S. § 13–101 (emphasis added). If we adopt the state's position, we would be focusing not on petitioner's conduct of ingesting heroin—conduct for which the state brought no criminal charge—but rather on the child's status as heroin-addicted.

■ We agree with petitioner that, were we to interpret A.R.S. section 13–3623 to reach the conduct on which this prosecution is based, we would offend due process notions of fundamental fairness and render the statute impermissibly vague. Due process requires "that criminal offenses be defined in terms sufficient to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle for the requirement is that no person should be required, at the risk of his liberty, to speculate as to the meaning of a criminal statute." *State v. Limpus,* 128 Ariz. 371, 375, 625 P.2d 960, 964 (App.1981) (citations omitted). Because the statutory reference to "child" does not include a fetus, petitioner could not reasonably have known she could be prosecuted for child abuse because of her prenatal conduct. *See Georgia v. Luster,* 204 Ga.App. 156, 419 S.E.2d 32, 34 (1992) (pregnant woman could not have known use of illegal drugs that affected the fetus could subject her to criminal prosecution).

Accepting the state's interpretation also would render the statute vague. The conduct prohibited by A.R.S. section 13–3623 is conduct likely to produce death or serious physical injury to a child. Were we to extend the statute to prenatal conduct that affects a fetus in a manner apparent after birth—conduct that would be defined solely in terms of its impact on the victim—the boundaries of proscribed conduct would become impermissibly broad and ill-defined.

Many types of prenatal conduct can harm a fetus, causing physical or mental abnormalities in a newborn. For example, medical researchers have stated that smoking during pregnancy may cause, among other problems, low birth weight, which is a major factor in infant mortality. F. GARY CUNNINGHAM, M.D. ET AL., WILLIAMS OBSTETRICS 974 (19th ed. 1993); STEVEN G. GABBE, M.D. ET AL., OBSTETRICS NORMAL AND PROBLEM PREGNANCIES 314–15, 923–24 (2d ed. 1991); GERARD N. BURROW, M.D. AND THOMAS F. FERRIS, M.D., MEDICAL COMPLICATIONS DURING PREGNANCY 476–78 (3d ed. 1988). Drinking alcoholic beverages during pregnancy can lead to fetal alcohol syndrome, a condition characterized by mental retardation, prenatal and postnatal growth deficiencies, and facial anomalies. CUNNINGHAM ET AL., *supra,* at 973; GABBE ET AL., *supra,* at 315–16; BURROW, *supra,* at 574–77.

A pregnant woman's failure to obtain prenatal care or proper nutrition also can affect the status of the newborn child. Poor nutrition can cause a variety of birth defects: insufficient prenatal intake of vitamin A can cause eye abnormalities and impaired vision; insufficient doses of vitamin C or riboflavin can cause premature births; deficiencies in iron are associated with low birth weight. BURROW, *supra,* at 122–23. Poor prenatal care can lead to insufficient or excessive weight gain, which also affects the fetus. *Id.* at 124–25. Some researchers have suggested that consuming caffeine during pregnancy also contributes to low birth weight. *See* GABBE ET AL., *supra,* at 317; BURROW, *supra,* at 572–73.

Other factors not involving specific conduct also can affect the fetus and, eventually, the status of the newborn child. The chance a woman will give birth to a child with Down's Syndrome increases if the woman is over the age of thirty-five. *See* Susan P. Pauker, M.D., Stephen G. Pauker, M.D., *Prenatal Diagnosis—Why is 35 a Magic Number?*, 330 NEW ENG.J.MED. 1151 (1994). A couple may pass to their children an inheritable disorder, such as TaySachs disease or sickle-cell anemia. GABBE ET AL., *supra*, at 274–77. Occupational or environmental hazards, such as exposures to solvents used by painters and dry cleaners, can cause adverse outcomes. *See id.* at 245–58. The contraction of or treatment for certain diseases, such as diabetes and cancer, also can affect the health of the fetus. *See* CUNNINGHAM ET AL., *supra*, at 970–71; 39 THE PEDIATRIC CLINICS OF NORTH AMERICA MEDICAL GENETICS I 118 (1992); GABBE ET AL., *supra*, 1199; BURROW, *supra*, at 540.

Allowing the state to define the crime of child abuse according to the health or condition of the newborn child would subject many mothers to criminal liability for engaging in all sorts of legal or illegal activities during pregnancy. We cannot, consistent with the dictates of due process, read the statute that broadly.

Other jurisdictions, after considering statutes similar to A.R.S. section 13–3623, consistently have concluded that child abuse statutes do not apply to prenatal conduct that harms a fetus. *See In re Valerie D.*, 223 Conn. 492, 613 A.2d 748 (1992) (statute did not permit termination of parental rights based upon prenatal conduct of mother); *Florida v. Gethers*, 585 So.2d 1140 (Fla.1991) (defendant could not be prosecuted for child abuse for ingesting cocaine during pregnancy because statute did not reach unborn fetus); *Kentucky v. Welch*, 864 S.W.2d 280 (Ky.1993) (criminal child abuse statute did not apply to defendant's use of controlled substance during pregnancy); *Ohio v. Gray*, 62 Ohio St.3d 514, 584 N.E.2d 710 (1992) (child endangerment statute did not apply to substance abuse occurring before birth of child); *Wyoming v. Osmus*, 73 Wyo. 183, 276 P.2d 469 (1954) (defendant's failure to receive medical care during childbirth was insufficient to sustain manslaughter conviction); *see also Reyes v. Superior Court*, 75 Cal.App.3d 214, 141 Cal.Rptr. 912 (1977) (child endangerment statute did not apply to prenatal conduct); *Johnson v. Florida*, 602 So.2d 1288 (Fla. 1992) (statute proscribing adult delivery of controlled substance to minor did not apply to *in utero* transmission); *Georgia v. Luster*, 204 Ga.App. 156, 419 S.E.2d 32 (1992) (statute proscribing delivery and distributing cocaine did not apply to transmission to a fetus when pregnant woman ingested cocaine); *Michigan v. Hardy*, 188 Mich.App. 305, 469 N.W.2d 50 (1991) (delivery of cocaine statute did not apply to pregnant woman's cocaine use that may have resulted in postpartum transfer during birthing process).

We know of no jurisdiction that has upheld a child abuse charge against a woman for conduct that harmed her fetus, even if the resulting condition affected the child after birth. This court also "declines the State's invitation to walk down a path that the law, public policy, reason and common sense forbid it to tread." *Johnson*, 602 So.2d at 1297.

Moreover, as many of the policy arguments advanced by petitioner and respondent demonstrate, the legislature is in a better position than this court to determine whether a woman's prenatal conduct is more appropriately addressed through education, medical and rehabilitative treatment, social welfare, criminal statutes, or some combination of these approaches. *See id.* at 1296.

[T]he legislature is composed of regularly elected members, subject to the electoral will of the population of their respective districts, and thus the legislature is more attuned to the will of the public on public policy than are the courts.... [T]he legislature conducts public hearings in a nonadversarial manner, and is more able to explore all prospective aspects of a situation that may factually occur when it creates a crime. This court, however, is limited to ruling solely on the specific issue in the single case before it, and we base our decision on the facts as developed by ad-

versarial parties as applied only to the limited issues preserved for review.

*Vo,* 172 Ariz. at 202, 836 P.2d at 415.

Indeed, the legislature already has evidenced its interest in addressing the difficult problems presented. In 1990, and again in 1993, the legislature considered a bill to amend A.R.S. section 13–3623. *See* H.B. 2054 41st Leg., 1st Sess. (1993); H.B. 2690 39th Leg., 2d Sess. (1990). The bill would have expanded the definition of child abuse to include causing a newborn to suffer injuries as a result of the mother's use of alcohol or illegal substances during pregnancy. The legislature, however, failed to enact the bill during either session.

During the 1995 session, the legislature enacted a bill designed to establish an advisory council on prenatal substance abuse. *See* Perinatal Substance Abuse; Advisory Council Act, ch. 215 (April 24, 1995). The purpose of the council is to develop a coordinated statewide strategy for dealing with substance abuse by pregnant women. Passage of this bill provides further evidence of the legislature's recognition of its role in addressing the problem of drug use during pregnancy.

"Where to strike a balance between competing considerations is a matter for the legislature. . . ." *DeBoer v. Brown,* 138 Ariz. 178, 182, 673 P.2d 922, 926 (App.1983). Petitioner and the state acknowledge the competing public policy arguments underlying the issue before the court: whether society should consider drug-addicted babies and substance abuse by pregnant women a public health matter or a criminal matter. We agree with the state's concession that the manner in which society should address this problem is "more appropriately considered by the legislature, not this Court."

## C.

Petitioner also argues that charging her with violating section 13–3623 violates her right to privacy under the Arizona and Federal Constitutions. Given our conclusion that Arizona's child abuse statute does not reach petitioner's conduct, we decline to reach that constitutional issue.

## III.

Based on the foregoing, we accept jurisdiction and grant relief by ordering the superior court to dismiss the indictment against petitioner.

NOYES, P.J., and GRANT, J., concur.