5 P.2d 918

**STATE of Arizona, Appellee,**

v.

**Lawrence Ebeneza COTTON, Appellant.**

**No. 1 CA–CR 99–0180.**

Court of Appeals of Arizona, Division 1, Department A.

May 16, 2000.

Janet A. Napolitano, Arizona Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Jacquelyn B. Eskay, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by James Haas, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## O P I N I O N

BERCH, Judge.

¶ 1 On August 14, 1997, Defendant Lawrence Cotton accidently shot his girlfriend, L.W., in the back of the head. L.W. was eight and one-half months pregnant at the time. Although L.W. died shortly after arriving at the hospital, her daughter was delivered alive. But the fatal injury to L.W. had so decreased the blood supply to the baby that the infant died the following day.

¶ 2 The State charged Cotton with two counts of reckless second degree murder. The jury, however, found Cotton guilty of two lesser-included counts of reckless manslaughter. *See* Ariz.Rev.Stat. Ann. ("A.R.S.") § 13–1103(A)(1) (Supp.1999–2000). Cotton appeals, raising two issues:

1. Did the trial court err in concluding that the Arizona homicide statutes apply to the killing of a newborn infant when the death results from injuries inflicted *in utero?*
2. Did the trial court err in defining reasonable doubt as required by *State v. Portillo?*

Finding no error, we affirm Cotton's convictions and sentences.

### A. Application of Homicide Statutes

■ ¶ 3 Cotton's appeal raises an issue of first impression: whether a newborn child who dies from injuries inflicted while the child was *in utero* is a "person" within the meaning of Arizona's homicide statutes.

¶ 4 Arizona's second degree murder statute provides in relevant part that a person commits murder if "without premeditation ... [and] [u]nder circumstances manifesting extreme indifference to human life, such person recklessly engages in conduct which creates a grave risk of death and thereby causes the death of another *person*." A.R.S. § 13–1104(A)(3) (Supp.1999–2000) (emphasis added). The manslaughter statute under which Cotton was convicted states that a person commits manslaughter by "[r]ecklessly causing the death of another *person*." A.R.S. § 13–1103(A)(1) (emphasis added). For purposes of these homicide statutes, " '[p]erson' means a human being," a definition we find not particularly elucidating. A.R.S. § 13–1101(3) (Supp.1999–2000).

¶ 5 On appeal, Cotton argues that Arizona's homicide statutes do not apply when the harm resulting in the infant's death occurred while the infant was still *in utero.* In other words, according to Cotton, because the injury in this case was inflicted on a fetus, the victim was not a "person" within the meaning of the homicide statutes.

■ ¶ 6 In construing statutes, we give words their plain and ordinary meaning, unless the legislature has clearly expressed an intent to give a term special meaning. *See State v. Mahaney*, 193 Ariz. 566, 568, ¶ 12, 975 P.2d 156, 158 (1999). When the Arizona Legislature revised the criminal code in 1978, the drafters abolished all common law crimes

and provided that "[n]o conduct or omission constitutes an offense unless it is an offense under this title or under another statute or ordinance." A.R.S. § 13–103 (1989).[1] Although there are no longer common law crimes in Arizona, the legislature continued in force the established common law meanings of terms used in the criminal statutes. *See Vo v. Superior Court,* 172 Ariz. 195, 200, 836 P.2d 408, 413 (1992).

¶ 7 Under the common law, only a person "born alive" can be the victim of murder. *See id.* Thus, the commonly accepted meaning of the terms "person" and "human being" in defining the crime of murder at the time the legislature adopted the current criminal code did not include a fetus, but did include a person who was born alive.[2] *See id.*

¶ 8 To support his argument that he could not be charged with murder of the infant in this case, Cotton relies primarily on this Court's decisions in *Vo* and *Reinesto v. Superior Court,* 182 Ariz. 190, 894 P.2d 733 (1995). Finding those cases distinguishable, we affirm Cotton's conviction for manslaughter of the infant.

¶ 9 In *Vo,* we concluded that the legislature did not intend to include "fetus" within the definition of "person" as the latter term is used in Arizona's first degree murder statute. 172 Ariz. at 202, 836 P.2d at 415. We therefore held that the trial court should have dismissed murder charges against the defendants for the death of a fetus that occurred after one of the defendants shot the pregnant mother. *See id.* at 206, 836 P.2d at 419. We reasoned that, in enacting the statute, the legislature had not expressed an intent to deviate from the common law prin-

ciple that only persons "born alive" could be the victims of homicide. *See id.* at 200, 836 P.2d at 413.

¶ 10 We also found support for our conclusion in *Vo* in the fetal manslaughter statute, A.R.S. § 13–1103(A)(5) (Supp.1999–2000), which, by defining the killing of an unborn child as a separate offense from the killing of a "person," evidenced a legislative determination that a fetus was not to be considered a person within the meaning of the murder statute. 172 Ariz. at 201, 836 P.2d at 414;[3] *see also State v. Brewer,* 170 Ariz. 486, 508, 826 P.2d 783, 805 (1992) (holding that defendant could not be charged with first degree murder of fetus in light of fetal manslaughter statute). We noted that where the legislature has intended to refer to an unborn child or fetus, it has done so specifically. *See Vo,* 172 Ariz. at 201, 836 P.2d at 414. We interpreted its failure to list a fetus as a "person" as evidence that the legislature did not intend to include a fetus as a victim under the homicide statute.

¶ 11 Cotton urges us to extend the reasoning in *Vo.* He maintains that his action in causing harm to a pregnant woman that fatally injured her child was like that of the defendants in *Vo.* He therefore reasons that, if it was not murder for the *Vo* defendants to cause the death of an unborn child, it similarly should not be murder or manslaughter for him to have harmed a fetus who later died of her injuries after birth. The flaw in Cotton's reasoning is that Cotton caused the death not of a fetus, but of a child who had been born. We therefore find *Vo* distinguishable and decline to extend it. Indeed, we find that *Vo* recognized the continuing vitality of the "born alive" rule, a conclusion that under-

---

**1.** Section 13–103 was amended in 1997 to abolish common law defenses. The amendment does not affect this decision.

**2.** The "born alive" doctrine has venerable roots. As observed centuries ago by Sir Edward Coke:

> If a woman be quick with childe, and by a potion or otherwise killeth it in her wombe, or if a man beat her, whereby the childe dyeth in her body, and she is delivered of a dead childe, this is a great misprision, and not murder; but if the childe be born alive and dyeth of the potion, battery, or other cause, this is murder;

for in law it is accounted a reasonable creature, *in rerum natura,* when it is born alive. 3 Coke, *Institutes* *58 (1648), *quoted in* William J. Maledon, Note, *The Law and the Unborn Child: The Legal and Logical Inconsistencies,* 46 Notre Dame Lawyer 349, 362 (1971).

**3.** Section 13–1103(A)(5), A.R.S., provides that a person commits manslaughter by "[k]nowingly or recklessly causing the death of an unborn child at any stage of its development by any physical injury to the mother of such child which would be murder if the death of the mother had occurred."

588

mines Cotton's contention and supports the conviction here.

¶ 12 Cotton also relies upon this Court's decision in *Reinesto*, 182 Ariz. at 192, 894 P.2d at 735. In that case, a woman's heroin use during pregnancy resulted in the birth of a baby who tested positive for heroin and experienced withdrawal symptoms. *See id.* at 191, 894 P.2d at 734. The State prosecuted her for child abuse. *See id.* We held that the child abuse statute did not apply to harm to a fetus that affects the child after birth because the statute proscribes only "conduct that directly endangers a child, not ... activity that affects a fetus and thereby ultimately harms the resulting child." *Id.* at 192, 894 P.2d at 735. Cotton maintains that this describes his conduct: The gunshot to L.W. was an act that affected a fetus and thereby harmed the resulting child and, therefore, based upon the reasoning in *Reinesto*, he should not be chargeable with murder.

¶ 13 The *Reinesto* holding, however, was strictly limited to the child abuse statutes at issue in that case. The Court noted that many prenatal maternal choices, such as having a baby late in life, drinking caffeinated coffee, smoking cigarettes, or not taking vitamins, might result in harm to the infant. *See id.* at 193–94, 894 P.2d at 736–37. Thus, although some of the language in *Reinesto* appears to support Cotton's position, the case fairly read does not because it focuses on voluntary acts or choices by the mother that relate to her health or well-being. *See also Cuellar v. Texas*, 957 S.W.2d 134, 140 (Tex. App.1997) (declining to apply holding of case similar to *Reinesto* to intoxication manslaughter resulting from automobile collision); *Kentucky v. Welch*, 864 S.W.2d 280 (Ky.1993) (holding that woman could not be prosecuted for child abuse for drug use while pregnant).

■ ¶ 14 Finally, Cotton claims that the fetal manslaughter statute might have applied to this case.[4] Relying on the reasoning in *Vo*, Cotton contends that the statute reflects a legislative determination that the State's other homicide statutes should not apply to situations in which fatal injuries are inflicted on a fetus, even if death does not result until after the child is born. We disagree.

¶ 15 By its terms, the fetal manslaughter statute applies only to the killing of an *unborn* child. It reflects a legislative decision to afford protection to unborn children that was not available under traditional homicide statutes because of the common law born alive rule. *See Vo*, 172 Ariz. at 203 n. 8, 836 P.2d at 416 n. 8 (discussing legislative responses of other states to cases recognizing born alive rule).[5] Absent any legislative history to the contrary, we presume that the legislature's adoption of section 13–1103(A)(5) merely reflects a desire to afford greater protection to the unborn fetus than was available under common law, not less protection to a child who, despite the homicidal conduct of another, happens to survive past birth.[6]

■ ¶ 16 That the shooting in this case occurred while the infant was *in utero* does not preclude her post-birth status as a "person" for purposes of Arizona's homicide statutes. While the homicide statutes require that the victim be a "person," they do not limit the nature or timing of the injury that causes the death of the "person." Addition-

4. Elsewhere in his brief, Cotton argues that, because he was acquitted of the murder of L.W., the State is precluded upon any retrial from charging him under the fetal manslaughter statute, which, by its terms, applies only if a person's conduct would constitute murder (but not manslaughter) if it resulted in the mother's death. Because we find the fetal manslaughter statute inapplicable to this case and affirm Cotton's convictions, we need not consider this argument.

5. For an extensive discussion of the born alive rule and its historic origins, see Clarke D. Forsythe, *Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms*, 21 Val.

U.L.Rev. 563 (1987). Although some commentators argue that the born alive rule is an anachronism in light of advances in the areas of obstetrics and forensics, *see Vo*, 172 Ariz. at 200 n. 4, 202, 836 P.2d at 413 n. 4, 415, such criticism favors the applicability of homicide statutes to the deaths of unborn, but viable, children, not the inapplicability of such statutes to babies such as the infant in this case who are not only viable, but are in fact born alive.

6. A "fact sheet" on the fetal manslaughter bill prepared by staff for the Senate Judiciary Committee noted that, under then-existing law, feticide was not punishable as a crime.

ally, the statutes do not require that all the elements of the offenses be immediately satisfied at the time of the defendant's conduct. *See Cuellar*, 957 S.W.2d at 139. "It is axiomatic that a homicide conviction, requiring the death of the victim as an element of the offense, may stand even though the victim's death is not instantaneous with the defendant's conduct but results from that conduct at a later time." *Id.; see also State v. Govan*, 154 Ariz. 611, 616, 744 P.2d 712, 717 (1987) (holding defendant liable for victim's death occurring nearly five years after defendant shot victim in neck, which caused quadriplegia that in turn caused fatal pneumonia). To limit the focus to the moment of the defendant's conduct would violate this precept. Thus, "it is not the victim's status at the time the injuries are inflicted that determines the nature of the crime . . ., but the victim's status at the time of death which is the determinative factor." *State v. Hammett*, 192 Ga.App. 224, 384 S.E.2d 220, 221 (1989). Because the infant here was undeniably a "person" at the time of her death a day after the shooting, it is irrelevant that the injuries that led to her death were inflicted while she was still *in utero*.

¶ 17 Courts in other jurisdictions have also consistently concluded that the death of an infant who is born alive from injuries inflicted *in utero* constitutes homicide. *See, e.g., United States v. Spencer*, 839 F.2d 1341, 1343–44 (9th Cir.1988) (kicking and stabbing of mother resulting in death of infant ten minutes after birth was killing of "human being"); *Ranger v. Georgia*, 249 Ga. 315, 290 S.E.2d 63, 66 (1982) (death of child, twelve hours after birth, caused by shooting of mother sufficient to sustain conviction for felony murder of child); *Illinois v. Bolar*, 109 Ill.App.3d 384, 64 Ill.Dec. 919, 440 N.E.2d 639, 643–45 (1982) (newborn surviving only long enough to exhibit a few heartbeats "individual" within meaning of manslaughter and reckless homicide statute); *Jones v. Kentucky*, 830 S.W.2d 877, 880 (infant who died from prenatal injuries fourteen hours

after birth was "person" within criminal homicide statutes); *Williams v. Maryland*, 316 Md. 677, 561 A.2d 216, 219 (1989) (death of child seventeen hours after birth from arrow wound inflicted upon mother supported manslaughter conviction); *New Jersey v. Anderson*, 135 N.J.Super. 423, 343 A.2d 505, 509 (1975), *reversed on other grounds*, 173 N.J.Super. 75, 413 A.2d 611 (1980) (twins who died within hours of birth "persons" within meaning of homicide laws); *People v. Hall*, 158 A.D.2d 69, 557 N.Y.S.2d 879, 883–84 (1990) (infant who died thirty-six hours after birth due to prenatal shooting of mother "person" within meaning of homicide statute); *Cuellar*, 957 S.W.2d 134 (infant who died forty-three hours after birth from injuries suffered by mother in car crash "individual" within meaning of manslaughter statute).

¶ 18 Although some of those decisions were based upon statutes expressly defining homicide to include the deaths of those who have been born alive, the absence of such language does not dictate a contrary interpretation. In *Wisconsin v. Cornelius*, 152 Wis.2d 272, 448 N.W.2d 434, 436 (1989), the defendant argued that, notwithstanding the inclusion of the born alive rule in the statutory definition of "human being," he could not be prosecuted for homicide for the death of a child resulting from the infliction of prenatal injuries. In rejecting the claim, the court noted that Wisconsin (like Arizona) had abolished common law crimes in favor of a criminal code. *See id.* at 437. Nevertheless, the court observed that common law rules not in conflict with the code were retained, and thus concluded that it would have employed the born alive rule in interpreting the homicide statute even absent a statutory reference to the rule. *See id.*[7] The same analysis applies here.

¶ 19 We also reject Cotton's claim that, if interpreted to apply to fatal injuries inflicted upon a child before the child's birth, Arizona's homicide statutes violate due process notions of fundamental fairness and are

---

7. The *Cornelius* court found only one jurisdiction that did not conclude that the death of an infant as the result of fetal injuries constituted homicide. 448 N.W.2d at 437 n. 5 (citing *Cordes v. Texas*, 54 Tex.Crim. 204, 112 S.W. 943 (1908)).

However, the discussion in *Cordes* was dicta, *see* 112 S.W. at 947, and, as noted above, Texas has subsequently elected to follow the uniformly accepted rule. *See Cuellar*, 957 S.W.2d at 140.

unconstitutionally vague. Due process requires that criminal offenses be defined in terms clear enough to give persons of ordinary intelligence notice of what conduct is prohibited and contain explicit standards of application so as to prevent arbitrary and discriminatory enforcement. *See Martin v. Reinstein*, 195 Ariz. 293, 317, ¶ 79, 987 P.2d 779, 803 (1999) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)); *see also Reinesto*, 182 Ariz. at 193, 894 P.2d at 736. A criminal statute is vague only if it fails to give reasonable notice of what conduct is prohibited or is drafted in a way that permits arbitrary and discriminatory enforcement. *See State v. Terrell*, 168 Ariz. 112, 113, 811 P.2d 364, 365 (1991) (citing *State v. Steiger*, 162 Ariz. 138, 141, 781 P.2d 616, 619 (1989)).

¶ 20 Once again, Cotton relies on *Reinesto*. In that opinion, we concluded that, were we to interpret the child abuse statute to encompass a pregnant woman's ingestion of heroin, the statute could also be read to reach such seemingly innocuous conduct as the ingestion of caffeine or the insufficient ingestion of vitamin C. *See Reinesto*, 182 Ariz. at 193, 894 P.2d at 736. We concluded that such a reading of the statute would render the statute impermissibly broad and leave the boundaries of proscribed conduct ill-defined. *See id.* In this case, however, the injuries to the child resulted not from innocuous conduct, but from the reckless discharge of a firearm into the mother's head. We find *Reinesto* distinguishable and find the statutes at issue here not unconstitutionally vague.

¶ 21 As to Cotton's claim that the application of our homicide statutes to conduct that results in the postpartum death of the child violates due process, we find the New York court's discussion in *Hall* persuasive that a person of ordinary intelligence should anticipate that firing a weapon into a crowd might constitute criminal conduct:

[I]t is impossible to perceive how an individual of even less than ordinary intelligence can fail to be aware that standing on a street and firing at someone in a crowd on the other side is not lawful conduct, and, in fact, defendant's behavior after the shooting in immediately divesting himself of the gun and lying low for the next several days clearly indicates that he recognized the criminality involved in his actions.... [I]t is simply ludicrous to suppose that a particular statute fails to provide fair notice of forbidden conduct if it does not expressly anticipate every possible criminal contingency.... [I]t is fatuous for [the defendant] to complain that he did not receive fair notice that he was acting in a criminal manner.

557 N.Y.S.2d at 885; *accord Spencer*, 839 F.2d at 1343–44 (rejecting vagueness challenge); *Jones*, 830 S.W.2d at 880 (same); *Cuellar*, 957 S.W.2d at 140 (same, citing *Hall*); *Cornelius*, 448 N.W.2d at 438 (refusing to apply decision prospectively only).

¶ 22 The same reasoning applies here. Although Cotton's apparently inadvertent discharge of the weapon was less egregious than Hall's conduct, the resulting harm was equally foreseeable. Like Hall, Cotton also obviously believed his conduct to be criminal at the time of the shooting because he initially told police that L.W. had shot herself. Only after being confronted with the physical unlikelihood that a rifle shot to the back of the head could be self-inflicted did he admit firing the fatal shot. Cotton's attempted deception reflects a consciousness of guilt that belies his due process claim that he could not know that his conduct was criminal.

¶ 23 In light of *Vo*'s recognition of the continuing validity of the centuries-old born alive rule, we conclude that a person of ordinary intelligence would anticipate that killing an infant under the circumstances here would constitute homicide. Moreover, because "a perpetrator of illegal conduct takes his victims as he finds them," *Hall*, 557 N.Y.S.2d at 885, it is irrelevant whether Cotton was actually aware that the baby could be wounded or killed as a result of his actions toward the mother.

¶ 24 Cotton also contends that it violates public policy to permit a conviction for murder for inflicting prenatal injuries if the child survives, but to allow a conviction only for fetal manslaughter if the child dies before birth. He reasons that such an interpretation would discourage a perpetrator from attempting to save the life of an injured

fetus.[8] We recognize the irony, but suspect that few persons who have engaged in homicidal conduct will render aid to their victims, fetal or otherwise. Rarer still would be the killer who would refrain from attempting to save the life of the fetus solely based upon the knowledge that allowing the child to die might reduce the perpetrator's culpability from murder to manslaughter. We note, however, that a defendant who refuses to render aid to the injured pregnant woman risks increasing from manslaughter to murder the charge for causing her death.

¶ 25 Even assuming that interpreting our homicide statutes to apply when the injured fetus dies after birth would have the effect Cotton claims, a contrary interpretation would result in even greater injustice. One who recklessly kills a fetus before birth under circumstances that would constitute murder of the mother could be convicted of fetal manslaughter. See A.R.S. § 13–1103(A)(5). However, under Cotton's interpretation, one who premeditatedly injures a child *in utero* could not be prosecuted for the later death, so long as the child lived long enough to be born: the fetal manslaughter statute would not apply once the child was born and the murder statute would not apply because no injury was inflicted on a "person." Thus, Cotton's interpretation would spawn the irony that the more serious criminal act of intentionally harming the fetus would carry no sanction if the child died after birth, while recklessly engaging in the same conduct would carry the possible sentence of ten and one-half years if the fetus died before birth. See A.R.S. §§ 13–1103(A)(5), –604 (Supp. 1999–2000).

¶ 26 It is inconceivable that our legislature would have intended that the perpetrator escape responsibility for the child's death in the former scenario, but not the latter. To the extent that Cotton is correct in arguing that the interplay between the fetal manslaughter statute and the murder statutes has created a perverse incentive not to render aid to a dying fetus, his policy arguments are best addressed to the legislature, which is the appropriate forum for determining what, if any, reform is appropriate. See Vo, 172 Ariz. at 202, 836 P.2d at 415 (discussing policy reasons for deferring to legislature with respect to questions of public policy).

## B. Defining Reasonable Doubt

¶ 27 Cotton argues that the trial court's jury instruction defining reasonable doubt was unconstitutional. However, the instruction given was the one mandated by our supreme court in *State v. Portillo,* 182 Ariz. 592, 898 P.2d 970 (1995). The court recently reaffirmed its commitment to the instruction in the face of claims similar to those advanced by Cotton. See *State v. Van Adams,* 194 Ariz. 408, 417–18, ¶¶ 29–30, 984 P.2d 16, 25–26 (1999). Accordingly, we find no error.

## CONCLUSION

¶ 28 We hold that Arizona's homicide statutes apply to the killing of a child who is born alive, even if the death results from injuries inflicted before birth. We also find that the trial court did not err in defining reasonable doubt as mandated by our supreme court. Cotton's convictions and sentences are affirmed.

CONCURRING: JAMES B. SULT, Judge, and SUSAN A. EHRLICH, Judge.

---

**8.** Cotton cites his efforts to summon help for L.W. immediately after the shooting as an example of such an effort.